UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

ROBERT F. MERCIER,
    Plaintiff,

v.                                          Case Number:  03 12611 MAP

CSX TRANSPORTATION, INC.,
    Defendant.

## DEFENDANT CSX TRANSPORTATION INC.'S MOTION IN LIMINE TO ADMIT COLLATERAL SOURCE EVIDENCE ON THE ISSUE OF CREDIBILITY

The defendant CSX Transportation, Inc. ("CSX") hereby submits this *Motion in Limine to Admit Collateral Source Evidence on the Issue of Credibility* ("*Motion*"). As grounds therefore, the defendant states that: (1) evidence of a party's receipt of collateral source benefits, such as evidence of the receipt of Railroad Retirement Board ("RRB") benefits, is admissible; and (2) evidence of collateral source benefits received as wages from other employment is also admissible. As further grounds therefore, the defendant states as follows:

### I.    FACTUAL BACKGROUND:

The plaintiff claims to have suffered an injury on May 20, 2003 which caused him to be disabled and unable to work for a period of time thereafter. He also claims a loss of income during this period. After his alleged injury on May 20, 2003, the plaintiff applied for and received disability benefits, in the amount of $550 per month, from the RRB. *See* transcript of the deposition of Robert F. Mercier, a copy of the relevant portions of which is attached hereto as Exhibit "A," at 68-69. As part of the process of receiving benefits from the RRB, the plaintiff stated to the defendant, through Dr. Striker's *Certification of Physician or Practitioner*, and to

–1–

the RRB in his initial application and through *Statements of Sickness*, that he suffered a severe muscle sprain of his lumbro-sacral spine and that he was totally disabled and unable to work. *See Certification of Physician or Practitioner*, dated July 8, 2003, a copy of which is attached hereto as Exhibit "B," and *Statement of Sickness*, a copy of which is attached hereto as Exhibit "C."

Through discovery, CSX learned that the plaintiff was not totally disabled during the period that he was out of work and allegedly injured. Instead, he was working part-time for his brother in law at C&N Contractors, a residential home siding installation business. *See* Exh. A at 69-96 and payroll records produced from Charles N. Nedeau, d.b.a. C&N Contractors, a copy of which is attached hereto as Exhibit "D." Therefore, in addition to the RRB benefits he received, the plaintiff also received, at the same time that he was claiming to be disabled, several thousand dollars in earned wages from his employment with a company called C&N Contractors.

Further, plaintiff's counsel has represented to this court that the plaintiff has received a target letter from the United States Attorney's Office for the Northern District of the District of New York concerning his application for and receipt of the RRB benefits. *See* letter from plaintiff's counsel to the court dated February 28, 2005, a copy of which is attached hereto as Exhibit "E."

## II.    DISCUSSION OF LAW:

### A.    Evidence of the Plaintiff's Receipt of Collateral Source Benefits Is Admissible:

According to the collateral source rule, the plaintiff's recovery from the defendant does not need to be "offset . . . by the amount of any benefits received from a source collateral to the defendant." McGrath v. Consolidated Rail Corp., 136 F.3d 838, 840 (1st Cir. 1998), *citing*

–2–

Lussier v. Runyon, 50 F.3d 1103, 1107 (1st Cir. 1995). The collateral source rule is meant to "mitigate[s] the danger of the jury finding no liability or reducing a damage award 'when it learns that plaintiff's loss is entirely or partially covered.'" McGrath, 136 F.3d at 840, *quoting* Moses v. Union Pac. R.R., 64 F.3d 413, 416 (8th Cir. 1995), *and* Tipton v. Socony Mobil Oil Co., 375 U.S. 34, 36-37 (1963) (per curiam). Evidence of collateral source benefits is generally inadmissible to "show that the plaintiff has received other compensation for his injury, whether from an accident insurance policy, from workmen's compensation, from an employer, or from other sources." Goldstein v. Gontarz, 364 Mass. 800, 808-809 (1974).

However, in McGrath v. Consolidated Rail Corporation, the First Circuit Court of Appeals expressly recognized that the collateral source rule "is not absolute and courts have carved out exceptions to the collateral source doctrine." McGrath, 136 F.3d at 840. The Court, in upholding the trial judge's decision to allow into evidence the plaintiff's receipt of disability benefits, acknowledged that the plaintiff's receipt of such benefits was relevant on the issue of malingering/credibility under a Rule 403 balancing analysis. "CSX offered the evidence of [the plaintiff]'s disability payments on the issue of [the plaintiff]'s credibility. Specifically, CSX presented collateral source evidence to show [the plaintiff's] lack of motivation for returning to work." Id. at 841. Under these particular circumstances, the Court, in ruling that the admission of collateral source evidence presented little likelihood of prejudice to the plaintiff, stated that "'if there is little likelihood of prejudice and no strong potential for improper use, and a careful qualifying jury instruction is given, then receipt of compensation benefits may be admissible for the limited purpose of proving another matter.'" Id. at 841, *quoting* Simmons v. Hoegh Lines, 784 F.2d 1234, 1236 (5th Cir.1986); *see also* Moses v. Union Pacific Railroad, 64 F.3d 413 (8th Cir.1995) (allowing collateral source evidence where plaintiff's case itself has made the

existence of such evidence of probative value); <u>Santa Maria v. Metro-North Commuter Railroad</u>,

81 F.3d 265 (2nd Cir.1996) (holding collateral source evidence admissible if plaintiff puts

financial status at issue).

The Appeals Court in <u>McGrath</u> also distinguished the U.S. Supreme Court's decision in

an earlier, seemingly conflicting FELA case, <u>Eichel v. New York Central R.R.</u>, 375 U.S. 253

(1963), as pre-dating the adoption of the Federal Rules of Evidence and as <u>not</u> mandating a rule

that collateral source evidence should be treated as being <u>per se</u> inadmissible. <u>McGrath</u>, 136

F.3d at 841; *see also* <u>DeMedeiros v. Koehring Co.</u>, 709 F.2d 734, 740 (1st Cir.1983) ("[I]n

<u>Eichel</u>, moreover, as Justice Harlan pointed out in his concurrence, the narrower question was

simply whether or not to uphold the district court's discretionary ruling"); <u>Gates v. Shell Oil</u>,

812 F.2d 1509, 1513 and n.3 (5th Cir. 1987) (citing "[o]ther courts [which] have carved out

exceptions to <u>Tipton</u> and <u>Eichel</u>," and concluding that "the decision to admit or exclude evidence

of [collateral] LHWCA benefits under Rule 403, Fed. R. Evid., rarely is beyond the trial court's

discretion"). In <u>McGrath</u>, the First Circuit concluded that the Supreme Court in <u>Eichel</u> "simply

determined that the district court abused its discretion because the prejudicial impact of the

evidence outweighed its probative value. Here, we come to the opposite conclusion." <u>McGrath</u>,

136 F.3d at 841.

Furthermore, Massachusetts law is consistent with that of federal law in the First Circuit,

as Massachusetts case law has "long recognized that in some circumstances, evidence of

collateral source income may be admissible, in the discretion of the trial judge, 'as probative of a

relevant proposition, say 'control' or <u>credibility of a particular witness</u>.'" <u>Corsetti v. Stone Co.</u>,

396 Mass. 1, 17 (1985) (emphasis in original, citation omitted).[1]  In <u>Corsetti</u>, the court allowed

such evidence to be admitted "because it was relevant on the question of malingering and

because the plaintiff 'ha[d] volunteered testimony as to penurious circumstances allegedly

resulting from his injury.'" <u>Jones v. Cincinnati, Inc.</u>, 32 Mass. App. Ct. 365, 372 (1992), *quoting*

<u>Corsetti</u>, 396 Mass. at 16-21.  In addition, "[i]f a witness' testimony makes the collateral source

income relevant to credibility, the defendant[s] may seek leave of court to bring such evidence to

the jury's attention." <u>Poncin v. Central Locating Service, LTD.</u>, 12003 Mass. Super. LEXIS 208,

*2 (July 1, 2003), a copy of which is attached hereto as Exhibit "F."

        The <u>Corsetti</u> decision is particularly relevant to this case.  There, as by analogy to this

case, "evidence that [the plaintiff] Corsetti's income after the accident was higher than his

income while he was working would . . . give substantial support to the defendant's contention

that he had a motive other than physical disability to remain out of work." <u>Corsetti</u>, 396 Mass. at

18.  Similarly, in <u>Corsetti</u>, as analogously here, the evidence of the plaintiff's receipt of collateral

source benefits:

> directly contradicted Corsetti's testimony ... that, as a result of
> Corsetti's injuries, his wife was required to work full-time up to
> the time of trial (inferentially because of Corsetti's lack of
> resources as a result of his injuries) ... that Corsetti and she had a
> bleak Christmas, partially because of lack of money ... [and] that

---

[1] *See also* <u>McElwain v. Capotosto</u>, 332 Mass. 1, 2-3 (1954) (noting that it is "within the trial judge's discretion to admit evidence that the plaintiff was being paid while he was out of work because, even though the sums paid to the plaintiff would not properly reduce the recoverable damages for actual loss of earning capacity due to the accident, the evidence nevertheless was relevant to the plaintiff's motive for staying out of work"), *quoting* <u>Corsetti</u>, 396 Mass. at 17; <u>Centola v. Driscoll</u>, 4 Mass. App. Ct. 817, (1976) (evidence of collateral source income properly admitted where limited to question of whether plaintiff's absence from work had been prolonged by reason of his receipt of insurance payments); <u>Nassif v. Smith</u>, 4 Mass. App. Ct. 814 (1976) ("Whether [the collateral source income] evidence was admissible for the limited purpose of affecting the weight of the plaintiff's testimony that he was unable to work on account of the accident was within the discretion of the judge ... as an exception to the 'collateral-source' rule").

> he did not go to movies because he could not afford to do so, again
> focusing on his lack of money as a result of his injuries.

Id. at 18-20 (parenthetical in original). In these circumstances, the Supreme Judicial Court

reasoned that "evidence of collateral source income is admissible where a plaintiff in a personal

injury action has volunteered testimony as to penurious circumstances allegedly resulting from

his injury ..., [and that] a plaintiff who affirmatively pleads poverty, 'should be forced to

confront the consequences of that choice on cross-examination.'" Id. at 20 (citation omitted); *see*

*also* id. at 31-32 n.2 (Abrams, J., dissenting) (citing six Federal and state cases, including

railroad cases, admitting evidence of collateral source benefits where plaintiff volunteered

evidence of "penurious circumstances"). Accordingly, the court in Corsetti concluded that the

trial judge's exclusion of collateral source evidence in that case constituted an abuse of discretion

and reversible error, requiring a new trial. Id. at 20-21.

In this case, in deposition testimony which will be admitted into evidence, the plaintiff

has unequivocally and affirmatively "pleaded poverty" within the collateral source exception

established in substantive Massachusetts law. *See* Exh. A at 64-68. Specifically, when asked if

he claims that "being out of work as a result of the May 20th, 2003 incident caused or contributed

to [his] losing the house," the plaintiff responded "Contributed, yes." He further stated that you

"[c]an't survive on $550 a month and pay everything and survive and live and eat." Id. at 67. In

addition, when asked if he suffered any other financial damages because of the incident, he

stated that he lost his car because he was behind in payments. Id. at 68.

In light of the plaintiff's affirmative statements here claiming to be impoverished as a

result of the alleged accident, an accident for which he was paid temporary wage continuation

benefits in a substantial amount, CSX should have the opportunity, like the defendant Stone

Company in the <u>Corsetti</u> case, "to challenge the seriously damaging testimony volunteered by [the plaintiff]" and to present "a cross-examination that strongly tend[s] to impeach all of [the plaintiff's] testimony by exposing the falsehood of some of it." <u>Corsetti</u>, 396 Mass. at 20; *see also* <u>Howe v. Marshall Contractors, Inc.</u>, 38 Mass. App. Ct. 981 (1995) ("When the plaintiffs brought out that they were forced after the accident to move to Maine because they were unable to pay the bills at their Manomet residence, the judge appropriately allowed the defendant to bring out the fact that, during part of the time between the accident and trial, the plaintiffs were receiving welfare assistance, and then, after a period of dispute, they received workers' compensation").

There is also substantial evidence of the plaintiff's malingering. He suffered, at most, a soft-tissue injury yet has not returned to his position as a conductor with CSX. Furthermore, the plaintiff's own doctor referred him back to work at CSX numerous times, as early as within six weeks after the incident, yet the plaintiff failed to return to work with CSX. In addition, while the plaintiff claims he is unable to return to work as a conductor, a non-physically stressful position, he has worked for C&N Contractors in a physically intensive position which requires him to take measurements, check supplies, maneuver siding and cut pieces of siding with a table saw. *See* Exh. A at 69-71, 74, 76, 78-80, 82. This is clear evidence that the plaintiff malingered and, on this issue alone, his receipt of benefits is admissible.

### B.    The Plaintiff's RRB Claim, and Documents Associated Therewith, Are Admissible as Evidence Against the Plaintiff's Claims, and to Impeach his Credibility

The plaintiff's is claiming, in this case, to have been disabled for a period of time during which he was receiving RRB disability benefits while he was also gainfully employed by, and

working for, C&N Contractors. The defendant expects to use the plaintiff's RRB claim to impeach his credibility. Through his RRB claim, the plaintiff sought and obtained compensation for a time during which he was (1) collecting disability and (2) failed to disclose his employment with C&N. As such, the evidence of the plaintiff's receipt of RRB benefits clearly impeaches his credibility, and it is therefore admissible. *See* Poncin, 12003 Mass. Super. LEXIS 208 at *2.

Further, this information is also admissible to prove the plaintiff's motive, opportunity, intent, preparation, plan and knowledge by going out of work for CSX and receiving RRB benefits while earning part-time and full-time additional income from C&N Construction. Fed. R. Evid. 404(b). At the time that the plaintiff was allegedly injured he was suffering from severe financial difficulties and arguably sought to relieve himself of the financial stress by working more for C&N Construction and collecting the RRB benefits. The conclusion the jury is entitled to draw the evidence is that the plaintiff was not at all injured as the result of his alleged May 20, 2003 railroad accident.

WHEREFORE, for all of the above-stated reasons, the defendant respectfully requests that its *Motion in Limine to Admit Collateral Source Evidence on the Issue of Credibility* be allowed.

## REQUEST FOR ORAL ARGUMENT

Pursuant to Local Rule 7.1(D), the defendant respectfully states that oral argument may assist the Court and requests a hearing on its *Motion in Limine*.

<div style="margin-left: 40%;">

Respectfully Submitted,
The Defendant,
CSX TRANSPORTATION, INC.
By its attorneys,


/s/Michael B. Flynn
Michael B. Flynn, BBO #559023
*mbflynn@flynnassoc.com*
Richard A. Davidson, Jr., BBO #552988
*radavidsonjr@flynnassoc.com*
FLYNN & ASSOCIATES, P.C.
400 Crown Colony Drive
Suite 200
Quincy, MA 02169
(617) 773-5500

</div>

DATED: _____

# Exhibit "A"

1

2

                                    Volume   I
                                    Pages    1 - 266
                                    Exhibits per index

3

4                   UNITED STATES DISTRICT COURT

5                    District of Massachusetts

6     ROBERT F. MERCIER,              )
                            Plaintiff )
7                                     )
      vs.                             )    Civil Action
8                                     )    No. 03 12611 JLT
      CSX TRANSPORTATION, INC.,       )
9                           Defendant )

10

11

12          DEPOSITION OF ROBERT F. MERCIER, a witness

13    called by and on behalf of the Defendant, taken pursuant

14    to the applicable provisions of the Federal Rules of

15    Civil Procedure, before Sandra L. Bray, Registered

16    Professional Reporter, CSR Number 103593, and Notary

17    Public in and for Commonwealth of Massachusetts, at the

18    offices of Flynn & Associates, 400 Crown Colony Drive,

19    Quincy, Massachusetts, on Friday, November 19,

20    commencing at or about 10:30 a.m.

21

22

23

24

65

1  Q.  So the accident happened in May.  You're
2      talking about October, November?
3  A.  September, I believe it was.
4  Q.  What happened?
5  A.  Couldn't keep up the payments.
6  Q.  Was there a foreclosure?
7  A.  Yes, sir.
8  Q.  And they actually took the house from you in
9      September 2003?
10  A.  Yes, sir.
11  Q.  So when did the foreclosure proceedings start?
12  A.  In -- I'm not quite sure.  June.
13  Q.  June?
14  A.  I believe so.  I'm not sure.
15  Q.  Did this take place in court someplace?
16  A.  Ballston Spa.
17  Q.  What was the name of the court?
18  A.  Ballston Spa Town Hall.
19  Q.  Town hall.  There's a court there?
20  A.  Yes, sir.  I live in the country.
21  Q.  But still subject to the New York court
22      system.  I mean what --
23  A.  It depends on the location you live in.
24  Q.  What was the name of the court, though?

66

1      District court?
2  A.  It's just a Milton town court, Town of
3      Ballston Spa.
4  Q.  Was there a lawsuit filed against you?
5  A.  No, just proceedings to catch up on payments.
6      I fell behind.
7  Q.  All right.  Who brought the proceedings
8      against you?
9  A.  The landlord.
10  Q.  What was the landlord's name?
11  A.  I don't remember.
12  Q.  Did you have a mortgage or something like
13      that?
14  A.  Actually, I owned it outright.  I was paying
15      lot rent in a mobile home park.
16  Q.  I got it.  So those proceedings started in
17      June?
18  A.  I believe so.  I don't remember.
19  Q.  And how long had you been delinquent at that
20      point in time?
21  A.  Three, four months.
22  Q.  What was the landlord's name, by the way?
23  A.  I don't remember.
24  Q.  You don't remember?

67

1  A.  I don't.
2  Q.  Were there any papers filed at the town hall?
3  A.  I believe so.
4  Q.  Are you claiming that your being out of work
5      as a result of the May 20th, 2003 incident
6      caused or contributed to your losing the
7      house?
8  A.  Contributed, yes.
9  Q.  How did it contribute that?
10  A.  Can't survive on $550 a month and pay
11      everything and survive and live and eat.
12  Q.  But you were already a few months delinquent
13      by the time --
14  A.  Which I was catching up on, and then I wound
15      up out of work, got behind again.
16  Q.  Was there anything else -- was there any other
17      financial consequence -- strike that.  Do you
18      claim that you suffered any other financial
19      damages --
20  A.  Lost my car.
21  Q.  -- as a result of this incident?  You lost
22      your car as well?
23  A.  As well.
24  Q.  Okay.  How did that happen and when?

68

1  A.  December of 2003.
2  Q.  Okay.  What happened?  Repo man took it?
3  A.  I was behind on payments, tried to catch up.
4      I told them to come and get it.  I couldn't
5      afford to keep the car.
6  Q.  When did they start chasing you for that
7      money?
8  A.  I'm not sure.  Middle or beginning -- about
9      March or so last year.
10  Q.  So it was, again, before the accident?
11      (The witness nodded.)
12  Q.  Yes?
13  A.  Yes.
14  Q.  And who foreclosed on the car?  Who
15      repossessed the car, rather?
16  A.  I believe it was AmeriCredit.
17  Q.  Do you know where they're out of?
18  A.  Canada, Texas.  I've been contacted by so many
19      people, I don't know.
20  Q.  Did you receive any wage continuation after
21      your accident?
22  A.  No, sir.
23  Q.  Do you receive any benefits from the Railroad
24      Retirement Board?

69

| | | |
|---|---|---|
| 1 | A. | Yes, sir. |
| 2 | Q. | When did you start receiving benefits from the |
| 3 | | RRB? |
| 4 | A. | May -- it was roughly around the end of June |
| 5 | | or July. |
| 6 | Q. | When did you first submit a claim to the RRB? |
| 7 | A. | I think it was sometime in June. I don't |
| 8 | | remember exactly. |
| 9 | Q. | Sometime in June? |
| 10 | A. | Yes, sir. |
| 11 | Q. | And had you been awarded some kind of a |
| 12 | | benefit from the RRB? |
| 13 | A. | Just a standard benefit. |
| 14 | Q. | Which is what, sickness? |
| 15 | A. | Sickness benefits. |
| 16 | Q. | How much do you receive? |
| 17 | A. | 550 a month. |
| 18 | Q. | Do you pay taxes on that? |
| 19 | A. | No, sir. |
| 20 | Q. | Do you get any monies from any other sources? |
| 21 | | MR. DeGEORGE: Now or then? |
| 22 | A. | Now or then? |
| 23 | Q. | At any point since the accident. |
| 24 | | MR. DeGEORGE: Okay. |

70

| | | |
|---|---|---|
| 1 | A. | Just from my brother-in-law. |
| 2 | Q. | What's that? |
| 3 | A. | I was doing some little bitty job -- chores |
| 4 | | for him. |
| 5 | Q. | Like what? |
| 6 | A. | Going to get coffee for him. |
| 7 | Q. | Anything else? |
| 8 | A. | Running errands, making sure he had the right |
| 9 | | supplies on his job site. |
| 10 | Q. | What's he do? |
| 11 | A. | Self-contractor. |
| 12 | Q. | Builds homes? |
| 13 | A. | Siding. |
| 14 | Q. | Roofing and siding? |
| 15 | A. | Just siding. |
| 16 | Q. | How many people does he have working for him? |
| 17 | A. | Three, four possibly. |
| 18 | Q. | And he's been doing this since May 20th of |
| 19 | | 2003, even before that? |
| 20 | A. | To help me out, yes. |
| 21 | Q. | No, but how long has he had that business? |
| 22 | A. | How long has he had it? |
| 23 | Q. | Yes. |
| 24 | A. | Thirty, thirty-five years. |

71

| | | |
|---|---|---|
| 1 | Q. | What's the name of the business? |
| 2 | A. | C & N Contractors. |
| 3 | Q. | CNN Contractors? |
| 4 | A. | C & N Contractors. |
| 5 | Q. | C, ampersand, N Contractors? |
| 6 | A. | Yes. |
| 7 | Q. | What's the address of that business? |
| 8 | A. | The address I live at. |
| 9 | Q. | That's the address of the business? |
| 10 | | (The witness nodded.) |
| 11 | Q. | Yes? |
| 12 | A. | Yes. |
| 13 | Q. | Is he actually involved in doing the siding |
| 14 | | itself? |
| 15 | A. | Yes, sir. |
| 16 | Q. | And does he employ -- how many other employees |
| 17 | | does he have? |
| 18 | A. | Three. |
| 19 | Q. | What are their names? |
| 20 | A. | Jimmy, Tony. |
| 21 | Q. | Who else? |
| 22 | A. | I'm the other one. |
| 23 | Q. | You're the other one? |
| 24 | A. | I'm the third one. |

72

| | | |
|---|---|---|
| 1 | Q. | What are their last names? |
| 2 | A. | Tony is Poutre. I'm not sure of Jimmy's last |
| 3 | | name. |
| 4 | Q. | Could you spell Tony's last name for me? |
| 5 | A. | P O U T R E. |
| 6 | Q. | P O U T R E? |
| 7 | A. | Yes, sir. |
| 8 | Q. | Is Jimmy's name John -- I'm sorry. Is there a |
| 9 | | Jim Miller? |
| 10 | A. | That could be his last name. |
| 11 | Q. | There's another guy named John Hudson? |
| 12 | A. | Hudson? |
| 13 | Q. | Hudson. |
| 14 | A. | Not that I know of. |
| 15 | Q. | Nathan Hale? Are you kidding me -- Nathan |
| 16 | | Hale? |
| 17 | A. | No longer with him. |
| 18 | Q. | Do you remember him working for him for some |
| 19 | | period of time? |
| 20 | A. | Some period of time. |
| 21 | Q. | James Beagle? |
| 22 | A. | That's his son-in-law. |
| 23 | Q. | That's his son-in-law? Does he work for him |
| 24 | | too? |

73

| | |
|---|---|
| 1 | A. Not anymore. |
| 2 | Q. He has, though, in the past? |
| 3 | A. He has helped out occasionally. |
| 4 | Q. Do you know where Mr. Hale lives? |
| 5 | A. I have no idea. |
| 6 | Q. Do you know where Mr. Miller lives? |
| 7 | A. Saratoga somewhere. |
| 8 | Q. Do you know where Mr. Poutre lives, |
| 9 | P O U T R E? |
| 10 | A. Poutre? |
| 11 | Q. Well, I have the spelling down as P O U T R E. |
| 12 | A. I might have had it wrong. |
| 13 | Q. No, I think it's P O U T R E. Where does he |
| 14 | live? |
| 15 | A. In the town of Milton. |
| 16 | Q. Milton, New York? |
| 17 | A. It's actually Ballston Spa, Milton, Milton, |
| 18 | New York. |
| 19 | Q. What about Mr. Hudson? |
| 20 | A. I don't know that person. |
| 21 | Q. Mr. Beagle? |
| 22 | A. Mr. Beagle is his son-in-law. He lives in |
| 23 | Wilton. |
| 24 | Q. Wilton, New York? |

74

| | |
|---|---|
| 1 | A. Saratoga Springs, wherever it is. |
| 2 | Q. For how long have you been working for |
| 3 | Mr. Nedeau? |
| 4 | A. I've worked for him on my off days since -- I |
| 5 | don't know -- the end of 2002 possibly. |
| 6 | Q. And what types of stuff did you do for him? |
| 7 | A. Just, like, taking down measurements, checking |
| 8 | on the supplies. |
| 9 | Q. Have you ever actually done any of the siding |
| 10 | work? |
| 11 | A. I might have handed him a couple pieces. |
| 12 | Q. Okay. Anything else? |
| 13 | (The witness shook his head.) |
| 14 | A. Not that I know of. |
| 15 | Q. You actually take measurements with a tape |
| 16 | measure? |
| 17 | A. Take measurements. |
| 18 | Q. Sometimes in siding, you need to have a guy up |
| 19 | on the ladder, a guy on the ground? |
| 20 | A. I never went up there. |
| 21 | Q. But have you been the guy on the ground? |
| 22 | A. On the ground. |
| 23 | Q. That's a necessary part of a siding crew; is |
| 24 | that correct? |

75

| | |
|---|---|
| 1 | A. Yes, sir. |
| 2 | Q. Because it takes too much time if a guy has to |
| 3 | go up the ladder and back down for supplies, |
| 4 | right? |
| 5 | A. Yes, sir. |
| 6 | Q. So you need a guy on the ground who's going to |
| 7 | supply the guy on the ladder, right? |
| 8 | A. Yes, sir. |
| 9 | Q. To keep him moving, right? |
| 10 | A. Yes, sir. |
| 11 | Q. Time is money, right? |
| 12 | A. Yes, sir. |
| 13 | Q. And Mr. Nedeau is losing money if he can't |
| 14 | bang those siding jobs out quick, correct? |
| 15 | MR. DeGEORGE: Object to the form |
| 16 | of the question. |
| 17 | Q. Based on your understanding of the way the |
| 18 | business works, right? |
| 19 | A. Yes, sir. |
| 20 | Q. And when you've worked for him, you've been |
| 21 | part of the three-person crew, right? |
| 22 | A. On the ground, yes, sir. |
| 23 | Q. There's two guys on the ladder and one guy on |
| 24 | the ground, right? |

76

| | |
|---|---|
| 1 | A. Yes, sir. |
| 2 | Q. And you've been the guy on the ground, |
| 3 | correct? |
| 4 | A. Yes, sir. |
| 5 | Q. And you've got to get supplies up to the guys |
| 6 | on the ladder, right? |
| 7 | A. Yes, sir. |
| 8 | Q. Okay. So you've got to walk from the truck |
| 9 | over to the ladder and then get it up to them, |
| 10 | right? |
| 11 | A. I suppose so. |
| 12 | Q. Sometimes you've actually got to climb the |
| 13 | ladder in order to hand it to them, correct? |
| 14 | A. No, sir. |
| 15 | Q. How is that transfer made? |
| 16 | A. Put on a piece of rope. |
| 17 | Q. And it's in a bucket or something like that? |
| 18 | A. Just a piece of rope with a hook on it. |
| 19 | Q. And then they pull it up? |
| 20 | A. Yes. |
| 21 | Q. And sometimes you've got to get siding up to |
| 22 | them, rights? |
| 23 | A. Same way. |
| 24 | Q. So you have to physically take the siding out |

77

```
1        of the truck and take it over to the ladder
2        and hand it up to them?
3   A.   Not out of the truck.  It's on the ground.
4   Q.   Well, to get it out of the ground -- you've
5        also said you make sure they have supplies,
6        correct?
7   A.   Make sure the supplies is there.
8   Q.   Are you the guy that drives -- when they run
9        out, you go over to the Home Depot or building
10       supply place and get it?
11  A.   Most of the supplies are there all the time.
12       I just check the inventory.
13  Q.   Where is this, at the house or at the job
14       site?
15  A.   At the job site.
16  Q.   Are you -- obviously, when the materials come
17       in, you have to get them off the truck?
18  A.   No.
19  Q.   How does that work?
20  A.   The company that delivers the siding, them
21       people take it off the truck.
22  Q.   So you guys don't get it at a building supply
23       store?  All of your jobs are supplied by a
24       wholesaler?
```

78

```
1   A.   By a wholesaler.
2   Q.   They're all delivered?
3   A.   And taken off the truck by their people.
4   Q.   They're in boxes sometimes, the siding, right?
5   A.   Yes, sir.
6   Q.   It's on the ground, right?
7   A.   Yes, sir.
8   Q.   You've got to bend over and open up those
9        boxes, right?
10  A.   No, sir.
11  Q.   You haven't done that before?  You haven't
12       done that before?
13  A.   I might have opened a box or two, yes, sir.
14  Q.   So there have been sometimes you've bent over
15       with a box cutter or whatever and opened up
16       those boxes, right?
17  A.   Yes, sir.
18  Q.   Because the guys are up on the ladder saying,
19       "I need a couple more pieces of siding,"
20       right?
21  A.   Yes, sir.
22  Q.   And then you've taken the pieces of siding out
23       and brought it over to them, right?
24  A.   Yes, sir.
```

79

```
1   Q.   And you don't do it one at a time; do you?
2   A.   Depends.
3   Q.   Sometimes you bring a few pieces of siding
4        over, right?
5   A.   Not too many pieces.
6   Q.   A few, right?
7   A.   A couple at the most.
8   Q.   They come in long sections, right?
9   A.   Yes, sir.
10  Q.   About twelve-feet long?
11  A.   Yes, sir.
12  Q.   So you bend over into these boxes, take these
13       pieces out, walk over to the ladder, and hand
14       it up to them, right?
15  A.   Yes, sir, when I can hand it to them.
16  Q.   And is it aluminum siding, vinyl?
17  A.   They don't make aluminum anymore.
18  Q.   They don't make it anymore.  I'm dating
19       myself.  Vinyl siding.
20  A.   It's all vinyl.
21  Q.   Shingles?
22  A.   No shingles.
23  Q.   Just vinyl siding?
24  A.   Just vinyl siding.
```

80

```
1   Q.   Who cuts the siding?
2   A.   Sometimes I've done the cutting.
3   Q.   There's a saw on the ground?
4   A.   There's a saw on a table.
5   Q.   On the ground?
6   A.   Well, it's set up.  It's about that high.
7   Q.   Ground man has to do the cutting, right?
8   A.   Sometimes.  Most of the times, I guess.  I
9        don't know.  Whoever's handy, I guess.
10  Q.   So you've done that, right?
11  A.   I've done that, yes, sir.
12  Q.   And you've never been the guy on the ladder?
13       (The witness shook his head.)
14  Q.   Your answer is no?
15  A.   No.
16  Q.   Mr. Nedeau, does he keep videotapes of job
17       sites?
18  A.   No, sir.
19  Q.   Do you know for a fact one way or the other?
20  A.   I know my brother-in-law doesn't take
21       pictures.
22  Q.   Well, sometimes contractors do that so they
23       can show the homeowner at the end?  No?
24  A.   Not to my knowledge.
```

81

1   Q. On any of the jobs that you've worked on since
2      May of 2003, has the homeowner kept any video?
3   A. Not that I know of.
4   Q. What about photographs?
5   A. It's possible. I don't know.
6   Q. Does he have a marketing book where he can go
7      around and say, "Look, here's some of my
8      projects"?
9   A. No, sir.
10   Q. Are you positive of that?
11   A. Positive.
12   Q. Do you know if any homeowners have taken
13      pictures?
14   A. It's possible. I don't know.
15   Q. Can you give me the names of some of the
16      homeowners that you've -- the projects you've
17      worked on?
18   A. I don't know the owners.
19   Q. Mr. Nedeau would know that?
20   A. He don't know the owners either.
21   Q. He owns the business; doesn't he?
22   A. He owns the business. He doesn't know the
23      homeowners.
24   Q. Are these brand-new houses?

82

1   A. Brand-new houses.
2   Q. So these aren't resides? These are brand
3      new?
4   A. Brand-new homes.
5   Q. Does he work for a general contractor?
6   A. He works for a couple different contractors.
7   Q. What are their names?
8   A. I believe one is Sam Scott, and the other one,
9      Bruce Hefflin, but he's deceased now.
10   Q. Anybody else?
11   A. Maybe one other guy. I don't remember his
12      name.
13   Q. Do you still work for Mr. Nedeau from time to
14      time?
15   A. From time to time.
16   Q. Have you ever worked for him on a full-time
17      basis?
18   A. When I was off, injured.
19   Q. When you have been off from the railroad?
20   A. Yes, sir.
21   Q. You were working for Mr. Nedeau full time?
22   A. Pretty much, to earn money to survive, to eat.
23   Q. Going back to Exhibit Number 1 -- strike that.
24      The next document or documents, W-2 from

83

1      Mr. Nedeau for you for the year 2003.
2      Attached to it are four pages of payroll
3      records pertaining to first and second quarter
4      of 2003, the third and fourth quarter of 2003.
5      Actually, let me revise that. The next
6      document will be a W-2, two pages attached to
7      it, those being the payroll records for the
8      four quarters of 2003. That will be Exhibit
9      6.
10      Then we'll mark as Exhibit 7 a two-page
11      document, which is payroll records for the
12      four quarters of 2004.
13      MR. DeGEORGE: If I can, are the
14      exhibits -- your representation of the
15      exhibits based on information you received
16      from the company or based on what you believe
17      they represent?
18      MR. FLYNN: Well, you can correct
19      me if you think I'm wrong.
20      MR. DeGEORGE: The W-2s, obviously,
21      I don't dispute.
22      MR. FLYNN: Don't dispute.
23      MR. DeGEORGE: But the handwritten
24      information you have?

84

1      MR. FLYNN: This has just been
2      produced by subpoena that we served -- in
3      response to a subpoena.
4      MR. DeGEORGE: Right.
5      MR. FLYNN: They appear to me to be
6      payroll records.
7      MR. DeGEORGE: We can ask
8      Mr. Mercier about that. But we're not sure
9      based on any representation from a company
10      representative, correct?
11      MR. FLYNN: No, I haven't spoken to
12      him.
13      (2003 W-2 and Payroll Records were
14      marked Exhibit Number 6 for
15      identification.)
16      (2004 Payroll Records were marked
17      Exhibit Number 7 for
18      identification.)
19   Q. Let me show you both of these exhibits, and
20      ask you if you recognize these documents.
21      MR. DeGEORGE: Take a look first at
22      what's been marked as Mercier 6 for
23      identification. Let us know when you're
24      finished. Then look at Mercier 7.

85

1        Can I see these?

2        (Document handed to counsel.)

3    Q.  Okay.  Sir, have you seen these records

4        before?

5    A.  Not until now.

6    Q.  You've never seen your W-2 before?

7    A.  Well, the W-2, I've seen.

8    Q.  You haven't seen your payroll records?

9    A.  I don't see those.

10   Q.  You do remember earning $6300 from Mr. Nedeau

11       in 2003, correct?

12   A.  That's what the W-2 says, yes.

13   Q.  I'm going to show you these payroll records.

14       They have several columns in them, dates down

15       the left-hand side, right?

16   A.  Yes, sir.

17   Q.  By the way, do you recognize that handwriting

18       as Mr. Nedeau's?

19   A.  Which writing?

20   Q.  Where it says, "Robert Mercier" at the top and

21       all these numbers?

22   A.  That's my writing up there.

23   Q.  That's your writing up there?

24   A.  Yes, I think so.

86

1    Q.  And what about these numbers?  Is that your

2        writing?

3    A.  That's not my writing, no.

4    Q.  Do you know whose it is?

5    A.  It's either my sister's or my brother-in-law.

6    Q.  Does your sister keep the books?

7    A.  My sister keeps the books.

8    Q.  Do you know if it was the practice of the

9        company to keep records like this -- to keep

10       documents like this as a report of the hours

11       that each employee worked?

12   A.  Yes, sir.

13   Q.  So you have seen these types of documents

14       before?

15   A.  No, I don't see the documents themselves.  I

16       know she keeps the records.

17   Q.  Is there a timecard or something that you give

18       to her?

19   A.  My brother-in-law takes care of that.

20   Q.  How does he do that?

21   A.  Just an index card.  He writes down the hours

22       everybody works.

23   Q.  When you show up -- he keeps a record of when

24       you show up and when you leave?  Yes?

87

1    A.  Yes.

2    Q.  He gives that to your sister-in-law, and he

3        makes up this exhibit, the last two pages of

4        Exhibit 6 and the two pages which are Exhibit

5        7, right?

6    A.  Yes, sir.

7    Q.  And you know these records are -- the purpose

8        of these records are to keep an accurate count

9        of the hours each employee worked, correct?

10              MR. DeGEORGE:  Objection to the

11       form of the question.  You can answer.

12   A.  Yes.

13   Q.  You as the employee fill out the top?

14   A.  Just the top, yes.

15   Q.  And at the time, the form is blank, right?

16   A.  Actually, I guess I do.  Yes, I filled out the

17       top.  But the rest of it, I never see that

18       after that.

19   Q.  But you fill out the top and you give it to

20       your sister-in-law (sic)?

21   A.  Yes, sir.

22   Q.  And she fills out the rest of it based on how

23       many hours you worked, correct?

24   A.  Yes, sir.

88

1    Q.  And this shows you were working -- you worked

2        in January, correct?

3    A.  January of when?

4    Q.  Of 2003.  This is the 2003 records.  You see

5        that?  I'm looking at the second page of

6        Exhibit 6.

7              MR. DeGEORGE:  Just tilt it back a

8        little bit.  I don't have a copy.

9    Q.  All right?

10   A.  Okay.

11   Q.  Then you didn't work again until May 9th,

12       right?

13   A.  January of 2003?  No, sir, apparently not.

14   Q.  Well, that's what the record seems to

15       indicate?

16   A.  That's what the records seem to indicate.

17   Q.  Is that consistent with your memory?

18   A.  I believe it's possible, yes, sir.

19   Q.  As far as you remember?

20   A.  As far as I remember, yes.

21   Q.  You worked in January 2003, but didn't work

22       again for your brother-in-law until sometime

23       during the week of May 9th, correct?

24   A.  Yes, sir.

89

1   Q.  Then you worked 6 hours the week of May 9th
2       and 11 the week of May 16th, correct?
3   A.  According to the records, yes, sir.
4   Q.  And that was the same week, May 16th, that you
5       were injured, correct -- allegedly injured on
6       the railroad, right?
7   A.  Yes, sir.
8   Q.  Then the very next week after you claim to
9       have been injured on the railroad was
10      May 23rd, you worked 6 hours, right?
11  A.  Yes, sir.
12  Q.  Then you didn't work again until June 20th
13      according to this record, correct?
14          MR. DeGEORGE:  I'm just going to
15      object because he didn't prepare the record.
16          MR. FLYNN:  I understand.
17          MR. DeGEORGE:  I mean you can ask
18      him what he recalls, obviously.
19          MR. FLYNN:  I'm just going from
20      this record.
21  Q.  This record indicates you didn't work again
22      until the week of June 20th, correct?
23  A.  That record, yes, sir.
24  Q.  Is that consistent with your memory?

90

1   A.  From what I can remember.
2   Q.  So the best of --
3   A.  The best of my knowledge.
4   Q.  You didn't -- you worked the week after your
5       railroad incident for your brother-in-law,
6       correct?
7   A.  I guess so.
8   Q.  Then you didn't work again for him until the
9       week of June 20th, correct?
10  A.  Yes, sir.
11  Q.  That week, according to this record, you
12      worked 10 hours for him, right?
13  A.  Yes, sir.
14  Q.  Is that consistent with your memory of what
15      you did that week?
16  A.  Probably, yes, sir.
17  Q.  Okay.  Then you worked for him the next week,
18      June 27th, right?
19  A.  Yes, sir.
20  Q.  And that week, you worked 28 1/2 hours,
21      correct?
22  A.  Yes, sir.
23  Q.  Going on to the third page of Exhibit 6, the
24      week of July 14th, you worked 7 1/2 hours,

91

1       right?
2   A.  That's what it says.
3   Q.  Is that consistent with your memory?
4   A.  I believe so.
5   Q.  Again, according to the record, the next one,
6       two, three, four, five, five weeks, you worked
7       no fewer than 25 hours each week, correct?
8   A.  Yes, sir.
9   Q.  Throughout July, right?
10  A.  Yes, sir.
11  Q.  And into August, right?
12  A.  Yes, sir.
13  Q.  Then August 29th, you only worked 9 hours
14      according to this record, right?
15  A.  Yes, sir.
16  Q.  And is all of that, by the way -- July and
17      August, is that all consistent with your
18      memory as to how much you worked the summer
19      after your injury?
20  A.  The best of my memory, yes.
21  Q.  Then there was a couple of weeks you didn't
22      work too much in the end of August, beginning
23      of September according to this record, right?
24  A.  According to that record, yes, sir.

92

1   Q.  Were you on vacation or something those two
2       weeks?
3   A.  Why would I be on vacation?
4   Q.  Do you typically go on vacation at the end of
5       the summer?
6   A.  No.
7   Q.  This is right around Labor Day, though, right?
8   A.  September?
9   Q.  Yes.
10  A.  Yeah.
11  Q.  Does the business slow down around Labor Day?
12  A.  Sometimes.
13  Q.  So is it fair to say that your drop-off in
14      hours during these two weeks is consistent
15      with the business' drop-off in hours?
16  A.  Possibly.
17  Q.  Is that consistent with your memory?
18  A.  Yes, sir.
19  Q.  And then, in September, if we look at this
20      record, according to this record, throughout
21      the month of September, you're working pretty
22      much full time.  Is that fair to say?
23          MR. DeGEORGE:  Objection to the
24      form of the question.

93

| 1 | A. | Yes, sir. |
| 2 | Q. | According to this record? |
| 3 | A. | Yes, sir. |
| 4 | Q. | Is that consistent with your memory of how |
| 5 |  | much you were working for your brother-in-law |
| 6 |  | in September 2003? |
| 7 | A. | It's possible. I don't remember. |
| 8 | Q. | And then according to this record, you |
| 9 |  | continued to work for him throughout |
| 10 |  | October -- or from October, November, and |
| 11 |  | December, you worked for him every week until |
| 12 |  | the end of the year, correct? |
| 13 | A. | According to that, yes, sir. |
| 14 | Q. | And is that consistent with your memory as to |
| 15 |  | how much you worked for him during the last |
| 16 |  | three months of 2003? |
| 17 | A. | To the best of my knowledge, memory, what I |
| 18 |  | remember. |
| 19 | Q. | Going on to Exhibit 7, the first page, this |
| 20 |  | indicates that you worked for your brother -- |
| 21 |  | this record indicates that you worked for your |
| 22 |  | brother-in-law -- strike that. This is the |
| 23 |  | same document or the same form document as |
| 24 |  | Exhibit 6, correct, the last two pages, right? |

94

| 1 | A. | Yes, sir. |
| 2 | Q. | Okay. And, again, this is your handwriting at |
| 3 |  | the top up here? |
| 4 | A. | That looks like mine, yes, sir. |
| 5 | Q. | So you filled one of these out or at least -- |
| 6 |  | at the beginning of each year, you signed the |
| 7 |  | top of one of these for your sister, correct? |
| 8 | A. | Yes, sir. |
| 9 | Q. | And then, again, she went ahead and filled |
| 10 |  | this out? This is her handwriting here, |
| 11 |  | right? |
| 12 | A. | I believe it's hers. I wouldn't swear -- I |
| 13 |  | can't swear to it. |
| 14 | Q. | These documents, Exhibit 7, were prepared in |
| 15 |  | the same way that Exhibit -- the documents in |
| 16 |  | Exhibit 6 were, correct? |
| 17 | A. | Yes, sir. |
| 18 | Q. | Okay. This document, Exhibit 7, the first |
| 19 |  | page at the top shows that you worked pretty |
| 20 |  | much full time throughout January and February |
| 21 |  | of 2004, correct? |
| 22 |  | MR. DeGEORGE: Objection to form of |
| 23 |  | your question. I'm not sure what you mean by |
| 24 |  | full time, but... |

95

| 1 | Q. | Full time for your brother -- brother-in-law. |
| 2 | A. | I put the hours in, I guess. |
| 3 | Q. | And that's consistent with your memory that |
| 4 |  | you worked for him pretty -- strike that. You |
| 5 |  | worked for your brother pretty much full time |
| 6 |  | through January and February of 2004, correct? |
| 7 | A. | I guess so. |
| 8 | Q. | Then you went back to work on the railroad -- |
| 9 |  | well, let me ask you this: Let's talk about |
| 10 |  | the railroad. You claim you were injured on |
| 11 |  | May 20th of 2003, right? |
| 12 | A. | Yes, sir. |
| 13 | Q. | And you then sought medical treatment 24 hours |
| 14 |  | later, right? |
| 15 | A. | Yes, sir. |
| 16 | Q. | You went to see a Dr. Kelly, right? |
| 17 | A. | Yes, sir. |
| 18 | Q. | Dr. Kelly said -- again, you were complaining |
| 19 |  | of some problems with your left side of your |
| 20 |  | neck and your left shoulder, right? |
| 21 | A. | Yes, sir. |
| 22 | Q. | And also your low back, right? |
| 23 | A. | Yes, sir. |
| 24 | Q. | But wouldn't you say that the neck was your |

96

| 1 |  | primary concern and left shoulder? |
| 2 | A. | I don't remember which was a concern. |
| 3 | Q. | Well, which was worse for you, your neck |
| 4 |  | problem or your low back problem? |
| 5 | A. | I think it was the back. |
| 6 | Q. | And he told you -- Dr. Kelly told you you have |
| 7 |  | a strain of your muscles, correct? |
| 8 | A. | I believe that's what he said. |
| 9 | Q. | Did he ever describe it as a soft tissue |
| 10 |  | injury? |
| 11 | A. | No, he didn't. |
| 12 | Q. | Your recollection is he called it a strain, |
| 13 |  | right? |
| 14 | A. | Yes, sir. |
| 15 | Q. | Okay. And what did he prescribe for you, any |
| 16 |  | medication? |
| 17 | A. | I don't remember. |
| 18 | Q. | Okay. Did he tell you just to take some |
| 19 |  | Tylenol over the counter? |
| 20 | A. | I think so. I don't remember. |
| 21 | Q. | And he told you to go to some physical |
| 22 |  | therapy, right? |
| 23 | A. | Which I did. |
| 24 | Q. | Right. And he told you that you could go back |

97

1    to work right then, right?

2  A. Which I did.

3  Q. Okay. Dr. Kelly said as far as he was

4    concerned, there was nothing about your

5    physical condition which would have prevented

6    you from going back to work, correct?

7  A. Yes, sir.

8  Q. Okay. And then you tried to go back to work?

9  A. I tried to go back, yes, sir.

10  Q. When was that? I'm talking about work with

11    the railroad now.

12  A. I think my first day back to work was March --

13    no.

14  Q. We're in May now.

15  A. Okay. Back to May of 2003. I think June,

16    June something. I don't remember the exact

17    date.

18  Q. So you stayed out for a couple of weeks?

19  A. Yes, sir.

20  Q. Then sometime the first part of June, you

21    tried to go back?

22  A. Yes, sir.

23  Q. What happened?

24  A. Went back for about a week and a half, I

98

1    believe, and my back just bothered me.

2  Q. What caused it to bother you?

3  A. Bouncing around on these locomotives.

4  Q. Anything else?

5  A. Climbing up and down, getting off and on the

6    engines.

7  Q. Anything else?

8  A. Throwing switches.

9  Q. What part of your body was hurt by that?

10  A. What do you mean by what part of my body?

11  Q. What part of your body hurt? Was it your

12    shoulder, your neck, your back?

13  A. It was my back when I throw the switches.

14  Q. What part of your back?

15  A. My lower back.

16  Q. Is it the switching that was causing your

17    lower back to hurt?

18  A. Contributed to everything. The seat collapse,

19    climbing up and down on the engines, throwing

20    the switches.

21  Q. I'm talking about when you went back to work

22    that first week in June. Is it your testimony

23    that it was throwing the switches that caused

24    your low back to hurt?

99

1  A. No.

2  Q. In other words, if you took that out of the

3    equation, just getting up and down out of the

4    locomotive and sitting there in the chair

5    riding, if you didn't have to throw any

6    switches, you just had to do those other two

7    things, do you think your back would have been

8    hurt?

9  A. My back was hurt because the chair broke.

10  Q. That's the original incident. I understand.

11  A. That's the original incident. Other than

12    that, now, because the equipment being old --

13  Q. I'm talking when you first went back to the

14    railroad in the beginning of June 2003.

15  A. It was being bounced around on these seats

16    with these locomotives.

17  Q. Anything else?

18  A. Not that I can recall.

19  Q. All right. And you say that that caused your

20    back to hurt so much that you couldn't go back

21    to work?

22  A. Yes, sir.

23  Q. Okay. So how many shifts did you actually

24    work the beginning of June when you went back?

100

1  A. Two trips a week, roughly a week and a half.

2  Q. Two trips a week, a week and a half. So you

3    worked for -- you did about four or five

4    shifts?

5  A. It was about five runs.

6  Q. Five runs. Okay. Round trips?

7  A. Two round trips and half of one, I guess.

8    Might have been three.

9  Q. Did you get dead-headed back or something?

10    Maybe three round trips?

11  A. Could have been three round trips.

12  Q. And then you said, "No more. I can't do it"?

13  A. Yes, sir.

14  Q. Did you go back to see Dr. Kelly?

15  A. No, sir. He's the company doctor. Why would

16    I see him?

17  Q. You did see him the second time, right?

18  A. To follow up from a previous injury, the

19    original injury.

20  Q. Right. You saw him a second time the

21    beginning of June, right?

22  A. I don't believe I went to see him in June.

23  Q. All right. How long -- we'll get back to that

24    later. How long were you out of work

101

1    following that first time you tried to go
2    back, those few trips?
3    A.   I was off after the injury roughly a week and
4    a half, two tops, I believe.  I don't
5    remember.
6    Q.   Let me get it clear.  You have your incident
7    on May 20th.
8    A.   May 20th.
9    Q.   Seek medical treatment maybe the next day.
10    You're out of work for maybe about a week and
11    a half.
12    A.   A week and a half.
13    Q.   You go back to work for another couple of
14    weeks?
15    A.   A week and a half, two tops.
16    Q.   So now, we're about June 20th, correct?
17    A.   Middle of June.
18    Q.   Middle of June.  Okay.  And then you stop
19    working at the railroad again, right?
20    A.   Yes.
21    Q.   And you go see Dr. Striker, correct?
22    A.   Correct.
23    Q.   Okay.  Again, we'll get back to the medical in
24    a bit, but when was the next time you went

102

1    back to the railroad after June 20th?
2    A.   Back to work full time?
3    Q.   Uh-huh.
4    A.   May 2nd or 3rd of 2004.
5    Q.   Okay.  Had you tried to go back to work in any
6    capacity at the railroad prior to that?
7    A.   Not until I was released from the doctor.
8    Q.   And that wasn't until May of 2004?
9         (The witness nodded.)
10    Q.   So that was the -- yes?
11    A.   Yes.
12    Q.   So that was the first time you went back to
13    work, right?
14    A.   Yes.
15    Q.   About a year after this incident where you
16    suffered a back strain, correct?
17    A.   Yes.
18    Q.   And during that whole period of time, you were
19    working for your brother-in-law?
20    A.   Yes.
21    Q.   Let me show you Exhibit Number 1, your answers
22    to interrogatories, Number 11.  Take a moment
23    to review that one, please.
24         Have you had an opportunity to review

103

1    your Question Number 11 and your answer?
2    A.   Yes, I did.
3    Q.   Okay.  This question asked you to state in
4    full and complete detail the time during which
5    you claim that you were unable to work as a
6    result of the incident, correct?
7    A.   Yes.
8    Q.   And the amount of money you had lost, right?
9    A.   Yes, sir.
10    Q.   Okay.  And you say that you were out of work
11    from May 20th to June 9th and then again from
12    June 29th of 2003 to March 1st of '04,
13    correct?
14    A.   Yes, sir.
15    Q.   Yet during those periods of time, you were
16    working for your brother-in-law, correct?
17    A.   I misunderstood the document.  I thought it
18    meant anything to do with the railroad.
19    Q.   Well, where in the question does it say
20    anything to do with the railroad?
21    A.   Where in the question does it say anything
22    else?
23    Q.   Where in the question does it say, sir,
24    anything to do with the railroad?

104

1    A.   It didn't.
2    Q.   It simply says -- let me see if I read it
3    correctly.  "State in full detail and complete
4    detail the time during which you claim you
5    were and/or will be unable to work as a result
6    of the alleged accident."  Did I read that
7    correctly?
8    A.   Yes.
9    Q.   You were doing work with your brother-in-law
10    during the periods of time --
11    A.   Which --
12    Q.   -- during the periods of time that you told us
13    in Answer Number 11 that you were unable to
14    work?
15    A.   On the railroad.
16    Q.   Yet you said nothing about this work for your
17    brother-in-law in this answer, correct?
18    A.   On the railroad.  I misunderstood the thing.
19    I'm not a lawyer.
20    Q.   Did you not understand what the word "work"
21    meant?
22    A.   I understand work, and I thought it meant
23    railroad.
24    Q.   But it doesn't say railroad work here, sir,

105

1  does it?

2  A.  No, sir, but that's what I thought.

3  Q.  Why did you think that?

4  A.  That's what I thought.  It was a railroad

5     document or a questionnaire I was getting.

6  Q.  Well, you understood what your allegation in

7     this lawsuit is, correct?

8  A.  I know my -- I know what the railroad's

9     responsibilities are too.

10  Q.  No, no.  You understand what your allegations

11     are in this lawsuit, right?

12  A.  Yes, sir.  Their negligence.

13  Q.  Your allegations -- and that you were injured,

14     right?

15  A.  Yes, sir.

16  Q.  And that your damages were that you were

17     unable to work --

18  A.  On the railroad.

19  Q.  Where does it say that in any of your

20     documents?

21  A.  I told you.  I misunderstood the documents.

22  Q.  Were you trying to hide that information from

23     us, sir?

24          MR. DeGEORGE:  Objection to the

106

1     form of the question.

2  Q.  Were you trying to hide that information from

3     us, sir?

4  A.  No, sir.

5  Q.  Were you trying to hide from us that you were

6     working for your brother-in-law during the

7     period of time you claim you were disabled

8     from your work on the railroad?

9  A.  No, sir.

10          MR. DeGEORGE:  Objection to the

11     form of the question.  He answered it.

12          (Discussion off the record)

13          (Luncheon recess taken from 12:34 p.m.

14          to 1:07 p.m.)

15  Q.  I want to go back to one area real quickly.

16     That hearing loss claim, you said that

17     somebody told you that you had hearing loss on

18     a test or something like that?

19  A.  I was told that I had slight hearing loss.

20  Q.  Who told you that?

21  A.  I believe it was the company.

22  Q.  Was it the company or was it a doctor -- a

23     screener that you had been sent to by a

24     lawyer?

107

1  A.  I believe I received -- I can't swear to it.

2     I believe I received a couple letters from

3     Conrail that I had a slight hearing loss.

4  Q.  Now, you're currently working now for the

5     railroad, right?

6  A.  Yes, sir.

7  Q.  And how is it -- are you marked off right now?

8  A.  Right now, for this, I had to mark off, yes,

9     sir.

10  Q.  And what was the purpose you put down for

11     marking off?

12  A.  For deposition.

13  Q.  Are you expecting to be paid for today?

14  A.  I'm not expecting to get paid.  My local

15     chairman said they'd put a slip in for what

16     I've lost, but he doubts they're going to pay

17     it.

18  Q.  Have you put a slip in?

19  A.  Not yet.

20  Q.  For what purpose are you going to put in a

21     slip?

22  A.  Attending the deposition.  I've got a certain

23     rule number and claim code to put it in under.

24  Q.  Well, you understand this isn't company

108

1     business, right?

2  A.  Regardless, I'm losing money.  I had to do it.

3  Q.  But you understand it's not company business?

4  A.  It's company business to me.

5  Q.  This is a lawsuit you chose to file?

6  A.  Because I got hurt on the job.  If I don't get

7     paid for it, I don't get paid for it.

8  Q.  Some background information, sir.  Education,

9     you went to one year of high school?

10  A.  Ninth grade.

11  Q.  Dropped out in 1966?

12  A.  Yes, sir.  I believe so.

13  Q.  You worked for a while and then went into the

14     service; is that what happened?

15  A.  Yes.

16  Q.  Where did you work?

17  A.  Supermarket.

18  Q.  Anywhere else?

19  A.  A record distributing company.  We packaged

20     45s and LPs and shipped them out.

21  Q.  Any place else?

22          (The witness shook his head.)

23  Q.  Were you injured at all at any of those jobs?

24  A.  No.

109

1  Q.  Have you ever been injured while working for
2     your brother-in-law?
3  A.  No.
4  Q.  Before coming to the railroad, did you hold
5     any other jobs other than the military?
6  A.  Just those two.
7  Q.  And since you started working at the railroad,
8     have you done any other work on the side other
9     than working for your brother-in-law?
10 A.  No, sir.
11 Q.  You hired out with the Penn Central in 1971,
12    right?
13 A.  Yes, sir.
14 Q.  That was after you came back from the Service?
15 A.  Yes, sir.
16 Q.  You were in the Marine Corps?
17 A.  Yes, sir.
18 Q.  From 1967 to 1971?
19 A.  Yes, sir.
20 Q.  You received -- what was your rank at the time
21    of discharge?
22 A.  I can't swear to it.  It was either -- I
23    believe it was E-3, lance corporal.
24 Q.  You had had a prior -- a higher rank before

110

1     that, right?
2  A.  Yes, sir.
3  Q.  And your rank was reduced as a result of a
4     court martial, correct?
5  A.  It wasn't a court martial.  It was just a
6     hearing, a disciplinary hearing.
7  Q.  It was an Article 65 hearing, right?
8  A.  If that was a court martial, it was a court
9     martial then.
10 Q.  So it was a court martial?
11 A.  I didn't stand in front of a jury or anything.
12    Just like captain's mass.
13 Q.  But you were brought under charges?
14 A.  Yes, sir.
15 Q.  Under Article 65?
16 A.  Yes, sir.
17 Q.  Which is the court martial of the Uniform Code
18    of Military Justice?
19 A.  I guess so.
20 Q.  That is what your understanding was?
21 A.  I guess so, yes.
22 Q.  And the charge was that you were AWOL?
23 A.  Yes, sir.
24 Q.  For four months?

111

1  A.  Yes, sir.
2  Q.  You were considered a deserter and a fugitive
3     during those four months?
4        MR. DeGEORGE:  Object to the form
5     of the question.
6  Q.  Correct?
7  A.  It's irrelevant to this case.
8  Q.  But that's what the Army considered you,
9     right?
10 A.  That's what they considered, yes.
11 Q.  Well, that's what you understood, right?
12 A.  About what?
13 Q.  You understood there was a warrant out for
14    your arrest while you were AWOL, correct?
15 A.  And I went and turned myself in and went back,
16    too.
17 Q.  After four months, correct?
18 A.  Yes, sir.
19 Q.  And you knew that you weren't supposed to be
20    absent from the service at that time, right?
21 A.  I had some personal problems.
22 Q.  Okay.  But you knew you weren't supposed to be
23    absent, right?
24 A.  I had some personal problems.

112

1  Q.  So the answer is yes?
2  A.  Yes.
3  Q.  And then ultimately, you turned yourself in,
4     right?
5  A.  Yes.
6  Q.  And you were arrested, correct?
7  A.  I wasn't arrested.
8  Q.  Were you put into custody?
9  A.  I returned to the base.
10 Q.  And they took you into custody; did they not?
11 A.  I guess that's what they did.
12 Q.  Did they put handcuffs on you?
13 A.  No, they didn't.
14 Q.  Did they read you your rights?
15 A.  They confined me to barracks, I believe.
16 Q.  And you went to this hearing?
17 A.  Yes, sir.
18 Q.  And you were found guilty of AWOL, right?
19 A.  Yes, sir.
20 Q.  AWOL meaning absent without leave?
21 A.  Yes.
22 Q.  And then your rank was reduced?
23 A.  Reduced, yes, sir.
24 Q.  And you had to forfeit some pay, right?

# Exhibit "B"

## CERTIFICATION OF PHYSICIAN OR PRACTITIONER
### (Family Medical Leave Act of 1993)



CSX TRANSPORTATION
R E C E I V E D

Once completed, promptly return this form to: CSX Transportation Medical Department
500 Water Street - J290
Jacksonville, FL 32202

JUL 1 7 2003

MEDICAL DEPARTMENT

1.  Employee's Name: _Robert F Mercier_ ID# _788704_ SSN# ~~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~~

2.  Patient's Name (if different from employee): _Same_

3.  The attached sheet describes what is meant by a "serious health condition" under the Family and
    Medical Leave Act. Does the patient's condition[7] qualify under any of the categories described? If
    so, please check the applicable category.

    (1) _____ (2) _X_ (3) _____ (4) _____ (5) _____ (6) _____, or none of the above _____

4.  Describe the medical facts which support your certification, including a brief statement as to how the
    medical facts meet the criteria of one of these categories:

    _Severe muscle spasm lumbar spine_

5.a. State the approximate date the condition commenced and the probable duration of the condition (and
    also the probable duration of the patient's present incapacity[8] if different):

    Date condition commenced: _62903_    Probable duration of condition: _80603_

   b. Will it be necessary for the employee to work only intermittently or to work on a less than full
      schedule as a result of the condition (including for treatment described in Item 6 below)?

        Yes _X_            No _____

      If yes, give the probable duration: _Patient remains totally disabled during the period above_

   c. If the condition is a chronic condition (condition No. 4) or pregnancy, state whether the patient is
      presently incapacitated[2] and the likely duration and frequency of episodes of incapacity[2]:

        _N/A_

---

[7] Here and elsewhere on this form, the information sought relates only to the condition for which the employee is
taking FMLA leave.
[8] "Incapacity", for purposes of FMLA, is defined to mean inability to work, attend school or perform other regular
daily activities due to the serious health condition, treatment therefore, or recovery therefrom.

| CSX Transportation is an Equal Opportunity Employer |
| We Do Not Discriminate on the Basis of Race, Color, Religion, Sex, National Origin, Age or Disability |

1 of 4                                                                 Revised 6/1/98

## CERTIFICATION OF PHYSICIAN OR PRACTITIONER
### (Family Medical Leave Act of 1993)

6.a. If additional treatments will be required for the condition, provide an estimate of the probable number of such treatments:

_10-Gwu l. cn: 80503_

If the patient will be absent from work or other daily activities because of treatment on an intermittent or part-time basis, also provide an estimate of the probable number and interval between such treatments, actual or estimated dates of treatment if known, and period required for recovery if any:

Probable number of treatments: _____      Time between treatments: _____

If any of these treatments will be provided by another provider of health services (e.g. physical therapist), please state the nature of the treatments:

_phys. Therapy in Clifton Park._

c. If a regimen of continuing treatment by the patient is required under your supervision, provide a general description of such regimen (e.g., prescription drugs, physical therapy requiring special equipment): _Phys Therapy, Mapuryphn 500 mg_
_b.i.d. and Carweet + H 100_

7.a. If medical leave is required for the employee's absence from work because of his/her own condition (including absences due to pregnancy or a chronic condition), is the employee unable to perform work of any kind?

Yes __✓__          No _____

b. If able to perform some work, is the employee unable to perform any one or more of the essential functions of the employee's job (the employee or the employer should supply you with information about the essential job functions)?

Yes _____          No _____

If yes, please list the essential functions the employee is unable to perform: _____

---

**CSX Transportation is an Equal Opportunity Employer**
We Do Not Discriminate on the Basis of Race, Color, Religion, Sex, National Origin, Age or Disability

Revised 6/1/98

**Document #13**

## CERTIFICATION OF PHYSICIAN OR PRACTITIONER
### (Family Medical Leave Act of 1993)

c.   If neither a, nor b, applies, is it necessary for the employee to be absent from work for treatment?

Yes __X__          No _____

8.a.   If leave is required to care for a family member of the employee with a serious health condition, does the patient require assistance for the basic medical or personal needs or safety, or for transportation?

Yes _____          No _____

b.   If no, would the employee's presence to provide psychological comfort be beneficial to the patient or assist in the patient's recovery?

Yes _____          No _____

c.   If the patient will need care only intermittently or on a part-time basis, please indicate the probable duration of this need: _____

_____          _____
(Signature of Health Care Provider)                    (Type of Practice)

Capital Region Orthopaedic Group          (518) 489-2666
1367 Washington Avenue Suite 200          _____
Albany, NY 12206                                          (Telephone Number)

_____          July 8, 2003
(Address)                                                        (Date)

***TO BE COMPLETED BY THE EMPLOYEE NEEDING FAMILY LEAVE TO CARE FOR A FAMILY MEMBER***

9.   When Family Leave is needed to care for a seriously ill family member, the employee shall state the care he or she will provide and an estimate of the time period during which this care will be provided, including a schedule if leave is to be taken intermittently or on a reduced leave schedule.

_____

_____

_____          _____
(Employee's signature)                                        8-15-03
                                                                        (Date)

**CSX Transportation is an Equal Opportunity Employer**
**We Do Not Discriminate on the Basis of Race, Color, Religion, Sex, National Origin, Age or Disability**

Revised 6/1/98

**Document #13**

## CERTIFICATION OF PHYSICIAN OR PRACTITIONER
### (Family Medical Leave Act of 1993)

10. Patient's Name: _Robert F Mercier_

**Authorization:** I authorize my health provider to discuss this information with the health care provider representing CSX Transportation for purposes of clarification and authentication of this certificate. **This authorization shall remain valid for the duration of such leave. A photocopy of this form is as valid as the original. The person who signs this form may have a copy of it upon request.**

Signature of Patient (or Legal Representative): X _Robert F Mercier_

Daytime Telephone Number of Employee: ( _518_ ) _885-6550_

---

**CSX Transportation is an Equal Opportunity Employer**
**We Do Not Discriminate on the Basis of Race, Color, Religion, Sex, National Origin, Age or Disability**

# EMPLOYEE NOTIFICATION FORM

CSX Transportation
Human Resources
500 Water Street - J400
Jacksonville, FL  32202

June 16, 2003

TO:    **Robert Mercier 788704**

FROM:    Human Resource Representative

SUBJECT: Request for Family/Medical Leave

On **6/13/03**, you notified us of your need to take family/medical leave due to:

‗    The birth of your child, or the placement of a child with you for adoption or foster care; or

**X**    A serious health condition that makes you unable to perform the essential functions of your job.

‗    A serious health condition affecting your _ spouse, _ child, _ parent, for which you are needed to provide care.

You notified us that you need this leave beginning on **6/13/03** and that you expect leave to continue until on or about **6/12/04**.

Your entitlement to leave, under the FMLA and CSX's Policy*, along with your rights and obligations are described below:

- The Family and Medical Leave Act provides certain CSX Transportation employees with leave eligibility of up to 12 work weeks during a 12-month period. When an employee is granted leave under the FMLA, such leave will be counted against the employee's 12-weeks eligibility.

- The 12-month FMLA leave period will be calculated by using a rolling 12-month period measured backward from the first day of the new leave period the employee is requesting.

> \*    *Approval of a request for FMLA does not constitute approval to obtain any form of alternate employment during the period of said leave.*

This is to inform you that:  (check appropriate boxes; explain where indicated)

1.    You **X do, _ do not** meet eligibility requirements for family/medical leave under the FMLA, which include working for the employer for at least one year, and a minimum of 1,250 hours within the preceding twelve (12) months.

2.    If approved, the requested leave **X will, _ will not** be counted against your annual FMLA leave entitlement.

3.    You **X will, _ will not** be required to furnish medical certification of a serious health condition.  If required, you must furnish certification by **7/3/03** (must be at least 15 days after you are notified of this requirement) or we may delay the commencement of your leave until the certification is submitted.

---

**CSX Transportation is an Equal Opportunity Employer**
**We Do Not Discriminate on the Basis of Race, Color, Religion, Sex, National Origin, Age or Disability**

Revised 6/1/98

## EMPLOYEE NOTIFICATION FORM

An employer may also request recertification at some later date if (1) the serious health condition continues beyond 30 days; (2) you request an extension of leave; (3) the circumstances described in your previous certification changes significantly; or (4) CSX otherwise has reason to question the continued validity of your previous certification.

Note: For the purpose of clarifying and authenticating medical certification, CSX's health care provider may contact your health care provider—with your permission.

**Failure to provide adequate certification may result in denial of such leave until certification is produced. A medical certification form (Document #13) and guidelines for its completing (Document #14) are enclosed in your packet. If you have misplaced these documents, please call your ER Representative immediately.**

4. You **X** have, _ have not requested intermittent leave or a reduced work schedule. For the purpose of requesting intermittent leave or leave on a reduced schedule due to a serious health condition of the employee or immediate family member, the Medical Certificate should provide documentation from a health care provider that such a leave is medically necessary and the expected duration and schedule of such leave.

5. You may elect to substitute accrued paid leave for unpaid FMLA leave. We _ will, _ will not require that you substitute the following accrued paid leave for unpaid FMLA leave:

    a.     _      Paid vacation leave

    b.   **X**     Paid sick time (including, but not limited to, Non-Contract Employee salary continuance under the GSX Salary Continuance and Long-term Disability Plan)

    c.   _____ Other paid leave _____

### EMPLOYEE BENEFIT STATUS AND LIABILITY FOR PAYMENT OF HEALTH INSURANCE

6. **Non-contract**: Health insurance benefits (including dental) will be maintained as if you were actively working. Unless otherwise indicated below, you must submit a check to the CSX Corporation's Benefits Department, Jacksonville, Florida to cover the amount of your contribution at the same time as they would normally be made through payroll deductions.

Any portion of the CSX Transportation health plan premiums which had been paid by the employee prior to FMLA leave must continue to be paid by you during the FMLA leave period. If premiums are raised or lowered, you are required to pay your portion of the new premium rates.

---

**CSX Transportation is an Equal Opportunity Employer**
We Do Not Discriminate on the Basis of Race, Color, Religion, Sex, National Origin, Age or Disability

                                                         **Revised 6/1/98**

# Exhibit "C"

# Statement of Sickness

**Instructions:** *This form is to be executed by (1) a doctor trained in medical, surgical, dental or psychological diagnosis of the infirmity described, (2) a certified nurse/midwife in cases of pregnancy or childbirth, (3) a supervisory official of a hospital or similar institution, (4) a chiropractor, (5) a Physician Assistant - Certified, or (6) a nurse practitioner. This form should be completed and returned to the patient immediately for prompt mailing; otherwise he/she may lose benefits. Supplementary medical information may be attached or furnished directly to the Railroad Retirement Board (RRB) at the address shown below. If such information is furnished, please include the patient's social security number and name on the report. Please complete section 2 on the reverse side if patient is incapable of signing forms.*

**The RRB is not liable for any charge in connection with completing this form.**

**1.** Patient's Name (First, Middle, and Last)
Robert Mercier

**2.** Patient's Social Security Number
#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

**3.** Have you examined or treated the patient for his or her injury or illness? ☐ Yes   ☐ No – Go to Item 9

**a.** Date patient became sick or injured
5-20-03

**b.** List all dates of examination and treatment for this infirmity
7-01-03

**c.** Probable date of next examination
8-05-03

**4.** Diagnosis and concurrent conditions
severe muscle sprain lumbosacral spine

**5.** Does the patient's condition require surgery? ☐ Yes   ☑ No – Go to Item 6

**a.** Date on which surgery was or will be performed
N/A

**b.** Surgical procedure that was or will be performed
N/A

Does the patient's condition require hospitalization?

☐ Yes – Give the period of hospital confinement: From _____ To _____

☑ No

**7.** If patient is not working because of maternity or childbirth, give: N/A

**a.** Date patient became unable to work ▶ 5-20-03    **b.** Estimated or actual date of delivery ▶ N/A

**8.** Give the date you believe the patient became or will become able to resume work in his or her occupation.
(If indefinite or unknown, please give an estimated date.) ▶ August 30-03

**9.** I certify that the information I am giving is true, complete, and correct. I understand that criminal and civil penalties may be imposed on me for false or fraudulent statements or for withholding information to cause or prevent payment of benefits by the RRB.

**Please print or type:**

Name of Doctor
James Strikeman

Signature of Doctor
James Stikeman

Degree/Title
M.D.

Address
Capital Region Orthopaedic Group
1367 Washington Avenue Suite 200
Albany, NY 12206

Office Telephone Number (Include Area Code)
(518) 489-2666

Tax Identification Number

Date
7-

*PAPERWORK REDUCTION ACT NOTICE TO DOCTOR*

Medical evidence is needed to support the payment of claims for sickness benefits under the Railroad Unemployment Insurance Act (RUIA). The RRB is authorized to collect this information under section 12(i) of the RUIA. You are not required to furnish this information. If you do not, however, no benefits can be paid to your patient. We estimate this form and the form on the back of this page take an average of 8 and 6 minutes to complete, respectively. The estimates include the time for reviewing the instructions, getting the needed data, and reviewing the completed forms. Federal agencies may not conduct or sponsor, and respondents are not required to respond to, a collection of information unless it displays a valid OMB number. If you wish, send comments regarding the accuracy of our estimate or any other aspects of this form, including suggestions for reducing completion time, to the Chief of Information Management, Railroad Retirement Board, 844 N Rush Street, Chicago, Illinois, 60611-2092. Send completed forms to:

**U.S. RAILROAD RETIREMENT BOARD**
**OFFICE OF PROGRAMS—OPERATIONS**
**POST OFFICE BOX 10695**
**CHICAGO, ILLINOIS 60610-0695**

EXHIBIT
MERCIER
1b

Doctor: See Reverse Side

FORM SI-1b (02-01)

# Exhibit "D"

ADDRESS Robert F _____

DATE OF BIRTH _____ 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

MARRIED OR SINGLE / NUMBER OF EXEMPTIONS 0 CITY OR TOWN _____ PHONE NO. _____ CLOCK NO.

POSITION _____ RATE _____ DATE _____

DATE STARTED _____ DATE TERMINATED _____

REMARKS _____ REASON _____

71 Petrified Gardens Rd Saratoga Springs, NY 12866

**FIRST QUARTER 2003**

| WEEK # | LINE # | HOURS WORKED REG. | OVER TIME | TOTAL EARNINGS | FEDERAL OLD AGE | WITH. HOLDING TAX | STATE TAX | DBL. | DEDUCTIONS | | | | TOTAL DED. | NET PAY |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 1/3 | 10½ | | 89 25 | 6 83 | 4 00 | — | 60 | | | | | 11 43 | 77 82 |
| 2 | 1/10 | 22 | | 229 50 | 17 56 | 20 00 | 3 60 | 60 | | | | | 41 76 | 187 74 |
| 3 | 1/17 | 12 | | 102 00 | 7 80 | 5 00 | — | 60 | | | | | 13 40 | 88 60 |
| 4 | | | | 420 75 | 32 19 | 29 00 | 3 60 | 1 80 | | | | | 66 59 | 354 16 |
| 5 | | | | | | | | | | | | | | |
| 6 | | | | | | | | | | | | | | |
| 7 | | | | | | | | | | | | | | |
| 8 | | | | | | | | | | | | | | |
| 9 | | | | | | | | | | | | | | |
| 10 | | | | | | | | | | | | | | |
| 11 | | | | | | | | | | | | | | |
| 12 | | | | | | | | | | | | | | |
| 13 | | | | | | | | | | | | | | |
| TOTAL 1ST QTR. | | | | 420 75 | 32 19 | 29 00 | 3 60 | 1 80 | | | | | 66 59 | 354 16 |

**SECOND QUARTER 2003**

| WEEK # | LINE # | HOURS WORKED REG. | OVER TIME | TOTAL EARNINGS | FEDERAL OLD AGE | WITH. HOLDING TAX | STATE TAX | DBL. | DEDUCTIONS | | | | TOTAL DED. | NET PAY |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 14 | 5/9 | 6 | | 51 00 | 3 90 | — | — | 60 | | | | | 4 50 | 46 50 |
| 15 | 5/16 | 11 | | 93 50 | 7 15 | 4 00 | — | 60 | | | | | 11 75 | 81 75 |
| 16 | 5/23 | 6 | | 51 00 | 3 90 | 4 00 | — | 1 60 | | | | | 4 50 | 46 50 |
| 17 | | | | 195 50 | 14 95 | 4 00 | — | 1 60 | | | | | 2 67 | 177 75 |
| 18 | 6/29 | 10 | | 85 00 | 6 50 | 4 00 | — | 60 | | | | | 11 12 | 73 90 |
| 19 | 6/41 | 26½ | | 242 25 | 18 53 | 20 00 | 4 40 | 60 | | | | | 45 53 | 196 72 |
| | | | | 327 25 | 25 03 | 20 00 | 4 40 | 1 80 | | | | | 56 62 | 370 00 |
| 20 | | | | | | | | | | | | | | |
| 21 | | | | | | | | | | | | | | |
| 22 | | | | | | | | | | | | | | |
| 23 | | | | | | | | | | | | | | |
| 24 | | | | | | | | | | | | | | |
| 25 | | | | | | | | | | | | | | |
| 26 | | | | | | | | | | | | | | |
| TOTAL 2ND QTR. | | | | 522 75 | 39 98 | 30 00 | 4 40 | 3 00 | | | | | 77 38 | 445 37 |

EMPLOYEES EARNINGS RECORD ONE YEAR SUMMARY

| NAME OF EMPLOYEE | | | | | | | | |
| ADDRESS | | | | | | CITY OR TOWN | | |
| DATE OF BIRTH | | MARRIED ☐ OR SINGLE ☐ | NUMBER OF EXEMPTIONS | | | PHONE NO. | | CLOCK NO. |
| POSITION | | RATE | DATE | | | DATE STARTED | | DATE TERMINATED |
| REMARKS | | | | | | REASON | | |

### THIRD QUARTER 2003

| WEEK # | LINE # | HOURS WORKED REG. | OVER TIME | TOTAL EARNINGS | FEDERAL OLD AGE | WITH-HOLDING TAX | STATE TAX | DBL. | | | TOTAL DED. | NET PAY |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 27 | 7/1 | 7½ | | 63 75 | 4 88 | 1 00 | — | | 60 | | 6 48 | 57 27 |
| 28 | 7/18 | 35 | | 297 50 | 22 76 | 30 00 | 6 50 | | 60 | | 59 86 | 237 64 |
| 29 | 7/25 | 34 | | 287 00 | 23 45 | 38 00 | 6 50 | | 60 | | 57 34 | 231 29 |
| 30 | 8/1 | 40 | 2 | 365 50 | 27 96 | 40 00 | 9 80 | 1 80 | 60 | | 78 36 | 287 19 |
| 31 | 8/8 | 25 | | 212 50 | 16 26 | 18 00 | 3 20 | | 60 | | 38 26 | 174 44 |
| 32 | 9/22 | 29 | | 246 50 | 18 86 | 22 00 | 4 40 | | 60 | | 45 86 | 200 64 |
| 33 | 8/29 | 9 | | 76 50 | 5 85 | 3 00 | | | 60 | | 9 45 | 67 05 |
| 34 | 9/5 | 10½ | | 87 25 | 6 83 | 4 00 | 1 40 | 1 90 | 60 | | 11 13 | 76 12 |
| 35 | 9/12 | 40 | 4 | 391 00 | 29 21 | 45 00 | 11 40 | | 60 | | 86 61 | 304 09 |
| 36 | 9/19 | 40 | 2 | 365 50 | 27 96 | 40 00 | 9 80 | | 60 | | 78 36 | 287 14 |
| 37 | 9/26 | 40 | ½ | 346 38 | 26 50 | 37 00 | 8 70 | | 60 | | 72 80 | 273 58 |
| 38 | | | | 1192 13 | 91 20 | 136 00 | 29 90 | | 240 | | 249 10 | 942 63 |
| 39 | | | | | | | | | | | | |

| TOTAL 3RD. QTR. | | | | 2743 38 | 209 88 | 268 00 | 60 30 | | 660 | | 544 18 | 2198 60 |
| | | | | 3686 88 | 281 05 | 327 00 | 88 30 | | 1140 | | 658 35 | 2998 13 |

### FOURTH QUARTER 2003

| WEEK # | LINE # | HOURS WORKED REG. | OVER TIME | TOTAL EARNINGS | FEDERAL OLD AGE | WITH-HOLDING TAX | STATE TAX | DBL. | | | TOTAL DED | NET PAY |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 40 | 10/3 | 27½ | | 233 75 | 17 88 | 21 00 | 4 00 | | 60 | | 43 48 | 190 27 |
| 41 | 10/10 | 37½ | | 318 75 | 24 38 | 33 00 | 7 40 | | 60 | | 65 18 | 253 37 |
| 42 | 10/24 | 19 | | 161 50 | 12 35 | 11 00 | 1 20 | | 60 | | 25 15 | 136 35 |
| 43 | 10/31 | 21 | | 178 50 | 13 66 | 13 00 | 1 60 | | 60 | | 28 86 | 149 64 |
| 44 | 11/7 | 21 | | 178 50 | 68 06 | 78 00 | 14 20 | 4 40 | 60 | | 163 37 | 149 64 |
| | | | | 178 50 | 13 66 | 13 00 | 1 60 | | 60 | | 28 86 | 149 64 |
| 45 | 11/14 | 21½ | | 182 75 | 13 98 | 13 00 | 2 00 | | 60 | | 29 58 | 153 17 |
| 46 | 11/21 | 15 | | 127 50 | 9 75 | 8 00 | | | 60 | | 18 35 | 109 15 |
| 47 | 11/28 | 25 | | 212 50 | 16 20 | 18 00 | 3 20 | | 60 | | 38 26 | 124 44 |
| 48 | 12/5 | 34½ | | 293 85 | 53 65 22 43 | 52 00 30 00 | 6 80 6 50 | 2 40 | 60 | | 114 45 59 63 | 58 670 233 72 |
| 49 | 12/12 | 22½ | | 191 95 | 14 63 | 14 00 | 2 10 | | 60 | | 31 63 | 157 62 |
| 50 | 12/19 | 27 | | 229 50 | 17 56 | 19 00 | 3 60 | | 60 | | 40 76 | 188 74 |
| 51 | 12/9 | Bonus | | 54 14 | 4 14 | — | | | | | 4 14 | 50 00 |
| 52 | 12/26 | 30 | | 255 00 | 19 51 | 21 00 | 4 80 | | 60 | | 48 91 | 206 09 |
| | | | | 1023 13 | 78 27 | 88 00 | 17 30 | | | | 184 91 | 838 19 |

| TOTAL 4TH. QTR. | | | | 2616 89 | 200 19 | 217 00 | 38 30 | | 720 | | 462 09 | 2154 80 |
| | | | | 3303 77 | 482 24 | 544 00 | 101 60 | | 1810 | | 451 40 | 5152 33 |

NAME OF EMPLOYEE: Robert J. Alvernaz

ADDRESS: 21 Petrified Gardens Rd, Saratoga Springs, N.Y. 12866

SOCIAL SECURITY: 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

DATE OF BIRTH:

MARRIED ☐ OR SINGLE ☑  NUMBER OF EXEMPTIONS: 0

PHONE NO:  CLOCK NO:

POSITION:  RATE:  DATE:  DATE STARTED:  DATE TERMINATED:

REMARKS:  REASON:

EXHIBIT

## FIRST QUARTER 2004

| WEEK # | L I N E # | HOURS WORKED REG. | OVER TIME | TOTAL EARNINGS | FEDERAL OLD AGE | WITH HOLDING TAX | STATE TAX | DBL | | | TOTAL DED. | NET PAY |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 1/2 | 40 | 1 | 352 75 | 26 99 | 37 00 | 9 20 | 60 | | | 75 79 | 276 96 |
| 2 | 1/9 | 30 | | 255 00 | 19 51 | 24 00 | 4 80 | 60 | | | 48 91 | 206 09 |
| 3 | 1/16 | 23 | | 195 50 | 14 76 | 15 00 | 2 40 | 60 | | | 32 76 | 162 74 |
| 4 | 1/23 | 36 | | 306 00 | 23 41 | 31 00 | 6 90 | 60 | | | 61 91 | 244 09 |
| 5 | 1/30 | 39½ | | 335 75 | 25 68 | 36 00 | 8 30 | 60 | | | 70 38 | 265 12 |
| 6 | 2/6 | 38 | | 145 00 323 00 | 11 55 24 71 | 145 00 34 00 | 31 60 7 80 | 3 00 60 | | | 290 95 | 173 18 255 89 |
| 7 | 2/13 | 34 | | 289 00 | 22 11 | 28 00 | 6 00 | 60 | | | 56 71 | 232 29 |
| 8 | 2/20 | 31½ | | 267 75 | 20 48 | 25 00 | 5 20 | 60 | | | 51 08 | 216 77 |
| 9 | 2/27 | 15½ | | 131 25 101 60 | 10 08 7 38 | 8 00 9 00 | 1 00 | 60 2 00 | | | 18 68 19 38 | 113 02 87 72 |
| 10 | 3/5 | 13 | | 110 50 | 8 95 | 6 00 | | 60 | | | 15 55 | 94 95 |
| 11 | 3/12 | 7½ | | 63 75 | 4 88 | 1 00 | | | | | 6 48 | 57 27 |
| 12 | 3/19 | 20 | | 170 00 | 13 01 | 12 00 | 1 60 | 60 | | | 27 21 | 142 79 |
| 13 | 3/26 | 19 | | 161 50 505 75 | 12 35 38 69 | 14 00 30 00 | 1 20 2 80 | 60 2 40 | | | 25 75 73 89 | 136 35 431 86 |
| TOTAL 1ST QTR. | | | | 2962 25 | 226 62 | 270 00 | 53 40 | 7 80 | | | 557 02 | 2404 43 |
| | | | | 2962 25 | 226 62 | 270 00 | 53 40 | 7 80 | | | 557 02 | 2404 43 |

## SECOND QUARTER 2004

| WEEK # | L I N E # | HOURS WORKED REG. | OVER TIME | TOTAL EARNINGS | FEDERAL OLD AGE | WITH HOLDING TAX | STATE TAX | DBL | | | TOTAL DED. | NET PAY |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 14 | 4/2 | 12½ | | 106 25 | 8 13 | 6 00 | | 60 | | | 14 73 | 91 52 |
| 15 | 4/9 | 15½ | | 131 75 | 10 08 | 8 00 | | 60 | | | 18 68 | 113 07 |
| 16 | 4/16 | 21 | | 178 50 | 13 66 | 13 00 | 1 60 | 60 | | | 28 86 | 149 64 |
| 17 | 4/23 | 19 | | 161 50 | 12 35 | 11 00 | 1 20 | 60 | | | 25 15 | 136 35 |
| 18 | 4/30 | 13½ | | 114 75 | 8 78 | 14 00 | 2 80 | 60 | | | 15 38 | 99 37 |
| 19 | 5/7 | 19½ | | 69 75 165 75 | 5 30 12 68 | 14 00 12 00 | 1 20 | 3 00 60 | | | 10 28 26 78 | 58 55 139 97 |
| 20 | 5/14 | 11 | | 93 50 | 7 15 | 4 00 | | 60 | | | 11 75 | 81 75 |
| 21 | 5/21 | 15 | | 127 50 | 9 75 | 8 00 | | 60 | | | 18 35 | 109 15 |
| 22 | 5/28 | 13½ | | 114 75 50 150 | 8 78 5 36 | 6 00 30 00 | 2 40 | 60 60 | | | 15 38 71 46 | 99 37 438 54 |
| 23 | 6/4 | 20 | | 170 00 | 13 01 | 12 00 | 1 60 | 60 | | | 27 21 | 142 79 |
| 24 | 6/11 | 16½ | | 140 25 | 10 73 | 9 00 | 30 | 60 | | | 20 63 | 119 62 |
| 25 | 6/18 | 15½ | | 131 75 | 10 08 | 8 00 | | 60 | | | 18 68 | 113 07 |
| 26 | 6/25 | 18 | | 153 00 595 00 | 11 70 45 52 | 10 00 39 00 | 80 70 | 60 4 72 | | | 23 10 89 61 | 129 90 505 38 |
| TOTAL 2ND QTR. | | | | 1789 25 | 136 88 | 113 00 | 6 00 | 7 80 | | | 264 33 | 1524 87 |

| NAME OF EMPLOYEE | | | | | | |
|---|---|---|---|---|---|---|
| ADDRESS | | | | | CITY OR TOWN | |
| DATE OF BIRTH | | MARRIED ☐ OR SINGLE ☐ | NUMBER OF EXEMPTIONS | | PHONE NO. | CLOCK NO. |
| POSITION | | RATE | DATE | | | |
| REMARKS | | | | DATE STARTED | DATE TERMINATED | |
| | | | | REASON | | |

### THIRD QUARTER 2004

| WEEK NO | HOURS WORKED REG. | OVER TIME | TOTAL EARNINGS | FEDERAL OLD AGE | WITH-HOLDING TAX | STATE TAX | DED. | | TOTAL DED. | NET PAY |
|---|---|---|---|---|---|---|---|---|---|---|
| 27 7/2 | 18 | | 153 00 | 11 70 | 10 00 | 80 | 60 | | 23 10 | 129 90 |
| 28 7/9 | 16½ | | 140 25 | 10 23 | 9 00 | 30 | 60 | | 20 13 | 119 60 |
| 29 7/16 | 20 | | 170 00 | 13 01 | 12 00 | 160 | 60 | | 27 21 | 142 79 |
| 30 7/23 | 20 | | 170 00 | 13 01 | 12 00 | 160 | 60 | | 27 21 | 142 79 |
| 31 7/30 | 18 | | 153 00 | 11 70 | 10 00 | 80 | 60 | | 23 10 | 129 90 |
| 32 8/6 | 18½ | | 186 85 | 60 15 | 53 00 | 590 | 300 | | 121 13 | 96 58 |
| | | | 157 25 | 12 03 | 11 00 | 80 | 60 | | | |
| 33 8/13 | 15½ | | 131 75 | 10 08 | 8 00 | — | 60 | | 18 68 | 113 07 |
| 34 8/20 | 18 | | 153 00 | 11 70 | 10 00 | 80 | 60 | | 23 10 | 129 90 |
| 35 8/27 | 32 | | 272 00 | 20 81 | 27 00 | 560 | 60 | | 54 01 | 217 99 |
| | | | 314 00 | 37 62 | 31 00 | 170 | 290 | | 130 3 | 533 78 |
| 36 9/3 | 24 | | 208 00 | 15 61 | 16 00 | 280 | 60 | | 35 01 | 168 99 |
| 37 9/10 | 13½ | | 114 75 | 8 78 | 6 00 | | 60 | | 15 38 | 99 37 |
| 38 9/17 | 21 | | 128 50 | 13 66 | 13 00 | 160 | 60 | | 28 86 | 149 64 |
| 39 9/24 | 15½ | | 131 75 | 10 08 | 8 00 | — | 60 | | 18 68 | 113 07 |
| | | | 629 00 | 48 13 | 43 00 | 770 | 290 | | 97 3 | 531 87 |
| TOTAL 3RD QTR. | | | 8129 35 | 162 90 | 127 00 | 16 70 | 780 | | 339 47 | 1789 85 |
| | | | 688025 | 226 40 | 510 00 | 2080 | 340 | | 1161 63 | 5719 15 |

### FOURTH QUARTER 2004

| WEEK NO | HOURS WORKED REG. | OVER TIME | TOTAL EARNINGS | FEDERAL OLD AGE | WITH-HOLDING TAX | STATE TAX | DED. | | TOTAL DED. | NET PAY |
|---|---|---|---|---|---|---|---|---|---|---|
| 40 10/1 | 19 | | 161 50 | 12 35 | 11 00 | 120 | 60 | | 25 15 | 136 35 |
| 41 10/8 | 13 | | 110 50 | 8 45 | 6 00 | — | 60 | | 15 05 | 95 45 |
| 42 10/15 | 14 | | 119 00 | 9 10 | 7 00 | — | 60 | | 16 70 | 102 30 |
| 43 10/22 | 10½ | | 89 25 | 6 83 | 4 00 | — | 60 | | 11 43 | 77 82 |
| 44 | | | | | | | | | | |
| 45 | | | | | | | | | | |
| 46 | | | | | | | | | | |
| 47 | | | | | | | | | | |
| 48 | | | | | | | | | | |
| 49 | | | | | | | | | | |
| 50 | | | | | | | | | | |
| 51 | | | | | | | | | | |
| 52 | | | | | | | | | | |
| TOTAL 4TH QTR. | | | | | | | | | | |

# Exhibit "E"



**BARISH LAW OFFICES, P.C.**

COUNSELLORS AT LAW AND PROCTORS IN ADMIRALTY



## VIA FAX: 413-785-0204 & REGULAR MAIL

February 28, 2005

The Honorable Kenneth P. Nieman,
United States Magistrate Judge
United States District Court
District of Massachusetts - Western Section
Federal Building & Courthouse
1550 Main Street
Springfield, MA 01103

  **Re: Robert F. Mercier v. CSX Transportation, Inc.**
     **U.S. District Court, District of Massachusetts-Western Section**
     **Civil Action No.: 03-12611 MAP**

Dear Judge Nieman:

  As you are aware, I represent the Plaintiff in the above-captioned matter. Pursuant to the Scheduling Order of May 28, 2004, a case management conference is scheduled for March 3, 2005, at 10:30 a.m. in Courtroom 3.

  I have been informed, however, by the Plaintiff that he has received a "target" letter from the U.S. Attorneys' Office notifying him that he is under investigation regarding his receipt of Railroad Retirement Board Benefits resulting from injury which formed the basis of the Complaint in the matter presently pending before Your Honor. The results of this investigation, therefore, may have a direct bearing on the outcome of this civil case. Based on the foregoing circumstances, I would respectfully request that Your Honor stay the civil pending the outcome of this investigation.

The Honorable Kenneth P. Nieman,
United States Magistrate Judge
Robert F. Mercier v. CSX Transportation
February 28, 2005

Page 2


Thank you for your courtesies in this matter.

Respectfully,

BARISH LAW OFFICES, P.C.

RUDOLPH V. DE GEORGE, II

RVD:dje

cc:    Richard Davidson, Esquire **Via Fax:(617) 773-5510 & Regular Mail**

# Exhibit "F"

Case 3:03-cv-12611-MAP   Document 30   Filed 05/27/2005   Page 42 of 46

Source: Legal > States Legal - U.S. > Massachusetts > Cases > MA Federal & State Cases, Combined 🔅
Terms: **poncin and cent and locating and serv** (Edit Search)

↳Select for FOCUS™ or Delivery
☐

*16 Mass. L. Rep. 431; 2003 Mass. Super. LEXIS 207, ***

Anna **Poncin**, Executrix n1 v. Central **Locating** Service, LTD et al. n2 Sharon Hewitt,
administratrix n3 v. Central **Locating** Service, Ltd. & Others n4

n1 Of the Estate of Lawrence **Poncin.**
n2 Bay State Gas Company, Richard Bray, Asplundh Subsidiary Holdings, Inc. & Asplundh Tree
Expert Company.
n3 Of the Estate of Bernard Hewitt.
n4 Bay State Gas Company, Richard Bray, Asplundh Subsidiary Holdings, Inc. & Asplundh Tree
Expert Company.

98-1067

SUPERIOR COURT OF MASSACHUSETTS, AT BRISTOL

16 Mass. L. Rep. 431; 2003 Mass. Super. LEXIS 207

July 1, 2003, Decided
July 1, 2003, Filed

**PRIOR HISTORY: Poncin** v. **Cent. Locating Serv.,** 2003 Mass. Super. LEXIS 208 (Mass.
Super. Ct., June 30, 2003).

**DISPOSITION: [*1]** Motion for reconsideration of bench ruling denied; motion in limine to
exclude evidence allowed in part.

### CASE SUMMARY

**PROCEDURAL POSTURE:** Plaintiffs, the executrixes of two gas explosion victims' estates,
sued defendants, who included a **locating** company and its employee, a gas company, a
tree services parent company, and a tree services operating subsidiary company. The
**locating** company and employee moved for reconsideration of allowance of the employee's
positive marijuana test to be introduced for the limited purpose of showing bias, and to
exclude that test.

**OVERVIEW:** The issue was the extent to which the test was relevant and was to be
admitted as compared to the prejudice to defendants. The executrixes argued the test was
relevant to show that the **locating** company was negligent, for example, for hiring,
retaining, or supervising the employee, and that the employee was negligent. The **locating**
company previously immediately dismissed employee locators who tested positive for drugs.
The **locating** company hired the employee and he took the drug test in March of 1998; that
same day he told an investigator, before hiring, that he did not know there could be gas
found where there was no gas service. The employee was not removed from the **locating**
company's payroll until January of 2000. The trial court found the marijuana test was
relevant to bias. The executrixes' evidence that was highlighted to show the employee could
have been under the influence of marijuana on the day of the **locating** also tended to show
that the employee was incompetent, and was not weighty enough to overcome the trial
court's finding, in its discretion, that the prejudicial effect of the test, not taken on the day of
the **locating,** exceeded its probative value.

**OUTCOME:** The trial court (1) denied the motion for reconsideration of its prior ruling of allowance of the employee's positive marijuana test to be introduced for the limited purpose of showing bias, (2) allowed the **locating** company's and the employee's motion to exclude the test from being offered to support an inference that the employee was under the influence of drugs prior to the explosion.

**CORE TERMS:** drug test, explosion, drug use, bias, marijuana, train, beer, bus, smoked marijuana, payroll, locate, abuse of discretion, probable cause, cocaine use, post-accident, terminated, infer, crew, exclude evidence, probative value, positive test, admissibility, outweighs, exterior, marked, sheet, site, log

**JUDGES:** E. Susan Garsh, Justice of the Superior Court.

**OPINIONBY:** E. Susan Garsh

**OPINION:** *MEMORANDUM OF DECISION AND ORDER ON CENTRAL **LOCATING** SERVICE, LTD.'s AND RICHARD BRAY'S MOTION IN LIMINE TO EXCLUDE EVIDENCE THAT BRAY TESTED POSITIVE FOR MARIJUANA AFTER THE EXPLOSION*

The defendants Central **Locating** Service, Ltd. ("CLS") and Richard Bray ("Bray") seek to exclude evidence that Bray tested positive for marijuana on March 5, 1998, the day following the explosion and three days after he performed the gas locate at issue in this case. According to Bray, he smoked marijuana for the first time on March 4 after learning of the explosion. In their supplemental memorandum, CLS and Bray urge this court to reconsider **[*2]** the May 5, 2003 bench ruling allowing evidence that Bray failed the drug test to be introduced for the limited purpose of showing bias. Bray was not removed from CLS's payroll until January of 2000 despite CLS's policy of immediate dismissal of locators who test positive for drugs. On March 5, 1998-- the same day as the drug test and before he knew that CLS would retain him on the payroll--Bray told an investigator that CLS had not trained him that gas service could exist at a location with no exterior indication of service. Several years later, with knowledge that CLS had retained him on its payroll despite its policy, Bray testified that he had falsely stated on March 5, 1998 that he had no training that utilities could be located in the basement without an exterior indicator of gas service. Thus, the positive test result is relevant to bias. The extent to which Bray's testimony helps or hurts CLS and varies from any prior statements made by Bray goes to the weight of the evidence and not its admissibility to show bias. The jury will receive limiting instructions when the evidence is introduced and again in the charge, if requested. The probative value of the evidence with respect **[*3]** to bias outweighs the potential for prejudice.

Plaintiffs argue that, even without expert testimony as to the length of time that marijuana smoked on March 2, 1998 would remain detectable by a drug test, the positive test result should be admissible as evidence from which the jury could infer that Bray was under the influence of a controlled substance when he performed the locate several days earlier. In *Johnson v MBTA*, 418 Mass. 783, 641 N.E.2d 1308 (1994), upon which the plaintiffs rely, the Court held that an employer properly terminated an employee for operating a bus while under the influence, based in part on a positive urine sample taken only one day following the alleged violation. *Id.* at 787- 85. The primary issue in that case was whether the employer had probable cause to demand the drug test. *Id.* at 785-86.

The cases from other jurisdictions on which the plaintiffs rely for the proposition that a positive drug test may create an inference that an employee was under the influence at an earlier time are distinguishable in light of the nature of the other evidence in those cases suggesting drug use that is absent in this case. E.g., *Brunet v. United Gas Pipeline Co.*, 15 F.3d 500, 505 (5th Cir. 1994) **[*4]** (not abuse of discretion to admit drug test performed two days after boat accident to show crew member under influence at time of accident where there was evidence of prior drug use and convictions by crew). n5 Indeed, in one of the cases cited by the plaintiffs, the test showed drug use prior to the accident, although it did not pinpoint precisely when drugs had been

taken. See _Johnson v. Washington Metropolitan Area Transit Authority_, 764 F. Supp. 1568, 1578 (D.D.C. 1991) (admission of drug test performed day of train accident as part of post-accident medical examination proper even though test could not narrow down when during previous week drugs were ingested, in light of delayed reaction time being consistent with cocaine use, train operator's odd behavior immediately before and after the accident, and fact that operator denied any drug use prior to the accident despite the test results to the contrary). n6 Cf. _Johnson v. MBTA_, 418 Mass. at 785-86 (employee on probation for failing a breathalyzer test properly terminated for driving a bus under the influence where a positive drug test one day after operation indicated cocaine use at some time [*5] and two supervisors, on day of operation, observed that employee's eyes had "a very heavy look, and . . . he appeared to be under the influence of something," and such observations amounted to probable cause to believe that he had operated the bus under the influence of some drug). There is no evidence here that Bray had smoked marijuana on any occasion prior to the explosion. See _Maillet v. ATF-Davidson_, 407 Mass. 185, 187-89, 552 N.E.2d 95 (1990) (evidence that plaintiff handled a beer can at some time on the day of the accident and had once before drunk a beer at work properly excluded as irrelevant to prove that he had consumed a beer at work on the day of the accident).

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - -

n5 The court's ruling on whether the admission of post-accident drug test evidence constituted an abuse of discretion was not essential to the decision because the court further found that "even if the court had abused its discretion in admitting the evidence, [the defendant] was not substantially prejudiced because the court expressly found that the crew's drug use did not cause the collision." _Brunet v. United Gas Pipeline Co._, 15 F.3d at 505. **[*6]**

n6 Evidence that the train operator was under the influence of cocaine at the time of the accident was the only basis for finding that the defendant had breached the applicable standard of care. _Johnson v. Washington Metropolitan Area Transit Authority_, 764 F. Supp. at 1573.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

The plaintiffs emphasize the evidence here that Bray violated numerous **locating** standards, disobeyed an order not to mark the site without a street index, marked the log sheet as an emergency when it was not one, used white-out to correct several other errors he made on his log sheet, and failed to remember on the morning of March 4 that he had already marked the site two days earlier. However, all of this circumstantial evidence is equally suggestive of incompetence as it is of drug abuse and does not, in and of itself, create a sufficient foundation for the admissibility of the drug test on the facts of this case. Further, this court, in its discretion, finds that the unfair prejudice that may result from the admission of Bray's drug test results as evidence from which the jury may infer that he had smoked **[*7]** marijuana before he performed his locate activities outweighs the probative value, if any, that such evidence may have.

ORDER

Accordingly, it is hereby _ORDERED_ that the Supplemental Memorandum, to the extent that it is deemed to be a Motion for Reconsideration of the bench ruling allowing the test result to be introduced to show bias, be and hereby is _DENIED_. It is further _ORDERED_ that Central **Locating** Service, Ltd. and Richard Bray's Motion In Limine to Exclude Evidence that Bray Tested Positive for Marijuana After the Explosion is _ALLOWED_ to the extent that it seeks to exclude the test results from being offered to support an inference that Bray was under the influence of drugs prior to the explosion.

E. Susan Garsh,

Justice of the Superior Court


Source: Legal > States Legal - U.S. > Massachusetts > Cases > **MA Federal & State Cases, Combined** 🛈
Terms: **poncin and cent and locating and serv**  (Edit Search)
View: Full
Date/Time: Friday, May 27, 2005 - 3:40 PM EDT

* Signal Legend:

🔴 - Warning: Negative treatment is indicated

🅀 - Questioned: Validity questioned by citing refs

⚠ - Caution: Possible negative treatment

🔷 - Positive treatment is indicated

🅰 - Citing Refs. With Analysis Available

🛈 - Citation information available

* Click on any *Shepard's* signal to *Shepardize*® that case.

About LexisNexis | Terms and Conditions


Copyright © 2005 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.

